THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
GUNTIS UTINANS (Impleaded), Defendant-Appellant.

First District (3rd Division)  No. 76-66

Opinion filed November 16, 1977.—Rehearing denied January 5, 1978.

Michael G. Cheronis, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Joan S. Cherry, and Neil H. Cohen, Assistant State's Attorneys, of counsel), for the People.

Miss JUSTICE McGILLICUDDY delivered the opinion of the court:

The defendant, Guntis Utinans, was indicted by the Cook County Grand Jury on January 3, 1972. The indictment charged that Utinans, along with Michael Briseno (hereinafter Michael), Paul DiMartino, and Richard Briseno (hereinafter Richard), committed the offenses of rape, aggravated kidnapping, deviate sexual assault (oral copulation), indecent liberties with a child (two counts—oral copulation and sexual intercourse), and contributing to the sexual delinquency of a child (two counts—oral copulation and sexual intercourse). Ill. Rev. Stat. 1969, ch. 38, pars. 11—1, 10—2(a)(3), 11—3, 11—4(a)(1), (2), 11—5(a)(1), (2).

Pursuant to pleas of guilty, co-defendants Michael and Richard were sentenced by the trial court to the Department of Corrections. Michael received 7 to 20 years for the rape count, 7 to 20 years for the aggravated kidnapping count, 7 to 14 years for the deviate sexual assault count, 7 to 20 years for each of the indecent liberties counts, and one year for each of the contributing to the sexual delinquency counts. Richard received 5 to

15 years for the rape count, 5 to 15 years for the aggravated kidnapping count, 5 to 14 years for the deviate sexual assault count, 5 to 15 years for each of the indecent liberties counts, and one year for each of the contributing to the sexual delinquency counts. The foregoing sentences were entered to run concurrently. During the pendency of the charges, co-defendant Paul DiMartino died.

Utinans entered a plea of not guilty to all charges of the indictment. Two days before the trial began, the State withdrew prosecution of the contributing to the sexual delinquency counts. Following several days of trial jury verdicts were returned against the defendant on each of the remaining charges on September 17, 1975. Judgment was entered on each of the verdicts. On November 25, 1975, after a presentence investigation and a hearing in aggravation and mitigation, the court indicated that the rape and indecent liberties counts were merged. The defendant was sentenced to the custody of the Department of Corrections to serve 15 to 30 years in the penitentiary on the rape count, 15 to 30 years on the aggravated kidnapping count, and 15 to 30 years on the deviate sexual assault count, all sentences to run concurrently. Upon the denial of a motion for a new trial the instant appeal was perfected, alleging numerous errors entitling the defendant to a reversal of his convictions, a reversal and remand for a new trial, or a reduction of sentences.

The offenses charged in the indictment all occurred during the late evening and early morning hours of October 16 and 17, 1971, within the City of Chicago. At approximately 9 p.m., October 16, the complaining victim, a 15-year-old high school student, alighted from a bus returning from her job at a candy store. The victim, carrying a purse, three books and a transistor radio, was on her way to meet her boyfriend at a neighborhood park. Walking toward the park in an easterly direction the victim was approached by a man, later identified as Michael. This man inquired of her as to where she was going, but she ignored him and continued walking. Michael then grabbed her around the waist and, despite her screams and struggle, he succeeded in carrying the victim to a nearby blue, four-door automobile driven by a man later identified as DiMartino.

Michael forced the victim to lie face down on the back seat of the car while he sat on top of her. While she was still struggling, Michael informed the victim that he had a knife and that she would be hurt if she did not keep quiet. After driving for about 30 to 35 minutes, the car came to a halt in front of a garage. Michael got out of the car and the victim noticed that she was in a well-lit location and she saw a red and white sign. At this time the driver pushed her head back down. After Michael returned, DiMartino drove the vehicle into the garage.

Michael then blindfolded the victim with a white rag, bound her hands together, and led her to a pile of burlap bags on the floor of the garage. As the victim was forced to lie on the burlap, Michael untied her hands and removed her clothing. The victim testified that the blindfold was not tied very tightly and that she was able to see both above and below it. She testified that the garage was long and narrow, that it had a skylight, and that she could see clearly the taillights of the car which her assailants had parked approximately five feet from her. This car was discovered during the police investigation and it was registered to DiMartino at the time of the offenses.

The victim's testimony indicates that Michael was first to sexually attack her. During this first act of forced sexual intercourse the loose blindfold permitted the victim to observe clearly her assailant's face. Next, DiMartino, after first tightening the blindfold, forced the girl to have sexual intercourse with him. While this second assault was in progress, the victim heard the door slam and heard other voices; DiMartino informed her that more people had arrived. Michael again approached the victim and this time forced her to perform oral copulation and another act of intercourse. Then a third individual, identified by the victim as Richard, proceeded to force the victim to have sexual intercourse with him. By the time Richard had completed his assault the blindfold was again loose and had fallen almost completely away from the victim's eyes. The defendant, Utinans, then approached the victim.

According to her testimony, the victim observed clearly the defendant as he took off his pants. He then forced her to have sexual intercourse with him. Utinans asked her how old she was and if she was a virgin. The victim replied that she was 15 years old and had been a virgin until that night. After the defendant finished his first attack upon the girl, DiMartino returned and forced her on her stomach in order to perform anal intercourse upon her. The victim screamed as if in pain and the other men cautioned DiMartino to "take it easy" with her.

Utinans returned to the victim, sat down beside her and attempted to console her. When the defendant then tried to engage in anal intercourse with the victim she screamed and he yielded. Positioning himself along side the victim, and about 7 or 8 inches from her, Utinans once again attempted to comfort her. She testified that he said that "they [the assailants] were the ones who were bad and its wasn't me [the victim] * * *." While speaking to the girl, Utinans was observed by her to be drinking from a wine bottle and smoking a marijuana cigarette. The defendant next placed his penis by the victim's mouth, touched it to her mouth, and forced her to perform oral copulation.

Following the defendant's second round of sexual assaults upon the victim, she was forced to submit to two more acts of sexual intercourse with Michael and another with DiMartino. The girl's testimony indicates that there may have been a fifth person present in the garage during the attacks; however, this individual was never adequately described nor identified. At the conclusion of about 4 or 4½ hours in the garage, during which time the victim was subjected to 12 acts of sexual assault, she was instructed by her assailants to get dressed.

Utinans then led the victim into the rear seat of DiMartino's car. She testified that during the ride her blindfold was loose enough to permit her to observe the defendant seated to her left, Michael to her right, Richard in the front passenger seat, and DiMartino driving. During the drive back to the victim's neighborhood the co-defendants "evaluated" her "performance." They referred to each other by the use of the names "Joe" (Michael), "Tom" (DiMartino) and "Pasquale" (Richard). They did not use any alias in referring to the defendant Utinans.

Some time between 2 a.m. and 3 a.m., October 17, the victim was set free about a block and a half from her home. According to her testimony, she recalled that she left part of the contents of her purse in the car. She called to the occupants to stop. Michael stepped out of the car to return her possessions. At this time the interior light of the vehicle was on and she saw all of the persons in the car, including Utinans.

The victim then went directly home and shortly thereafter informed her parents of what had happened to her. Following a shower, she was taken promptly to a local hospital for examination and treatment. Police officers, informed of the girl's complaints to her parents, arranged to meet the victim and her parents at the hospital. Because the local hospital would not examine victims of sexual assaults, the police arranged for the victim's transfer to the Cook County Hospital. At the time of trial the State and the defendant stipulated that the examination at Cook County Hospital disclosed the presence of sperm within the victim's vaginal cavity and trauma in the vagina area.

From the hospital the girl was taken to a police station where she was interviewed by several police officers. The interview was recorded on a cassette tape by Officer James Sesso and the content of the recording was summarized the following day in a typewritten report. The victim was finally taken home at about 7:30 a.m., Sunday, October 17.

Three days later the complaining witness was asked to go to the police station to view a lineup. From eight individuals she picked Michael, DiMartino, Richard, and the defendant, Guntis Utinans, on the basis of physical characteristics and voice identification. The victim positively identified these four men as her assailants. The police took the victim to a

building on the west side which she identified as the place of her confinement and assault. Michael was employed at this building and at the time of his arrest, he possessed a key fitting its lock.

Further State's evidence consisted in the testimony of the victim's mother and of several police officers. The mother related, among other things, a telephone conversation she had on the night of the offenses with an individual who called and identified himself as the victim's boyfriend. Three police officers testified concerning their investigation of the victim's complaint and the procedures which led to the arrest of the defendant. Officer Sam Louis related his interview with Utinans following the latter's arrest. During this interview the defendant acknowledged that he knew Michael and Richard. Still another police officer was called to testify concerning the cassette tape recording of the victim's original interview with the police, and his unsuccessful efforts to locate the tape recording which has been lost.

Utinans did not testify. As his defense he presented the testimony of Officer James Sesso of the Chicago Police Department in the effort to impeach the testimony of the complaining witness. After refreshing his memory by means of the typewritten summary of the tape recorded interview of the victim, Sesso related that the victim had never mentioned anyone fitting the description of Guntis Utinans. He further testified that the first interview of the girl accounted for the involvement of "Joe," "Tom," and "Pasquale," but not the defendant. According to his recollection of the interview, the victim did not indicate her blindfold was loose at any time during the assaults. While the victim could not remember to whom she first described the defendant, her testimony indicates that she had spoken with many police officers that first morning and that she believed that she had accounted for Utinans' presence and participation in the offenses in some manner. No other witnesses were called to either affirm or deny the victim's recollection of her original statements to the police. The defense did not introduce into evidence the typewritten summary of the cassette recording, but the defendant did object to the nonproduction of the recording by the State, and sought relief for the State's conduct which was responsible for the disappearance of the cassette tape.

The defendant raises 11 contentions of error committed in the course of the trial court proceedings: (1) The evidence generally fails to prove beyond a reasonable doubt that the defendant is guilty of the offenses for which he was convicted. (2) The evidence fails to prove beyond a reasonable doubt that the defendant is guilty of aggravated kidnapping and deviate sexual assault. (3) The State failed to preserve and produce the cassette tape recording of the police interview with the victim. (4)

Testimony concerning police investigations leading to the arrest of the defendant violated his right to confront those inferentially accusing him. (5) The corroborating testimony of the victim's mother concerning a telephone conversation with someone identifying himself as the victim's boyfriend is hearsay amounting to a violation of the confrontation clause. (6) The jury was erroneously exposed to a portion of the defendant's pretrial statement to the police which had been excluded by the court. (7) The defendant was precluded from effectively arguing his theory of the case by the court's rulings during closing argument and refusal to give a requested instruction to the jury. (8) A portion of the defendant's cross-examination of the victim was erroneously stricken from the record in the jury's presence immediately prior to final arguments. (9) Prosecutorial misconduct during closing arguments deprived the defendant of a fair trial. (10) The cumulative effect of contentions (4) through (9) deprived the defendant of a fair trial. (11) The sentences imposed were illegal and excessive: (a) the defendant was penalized for exercising his right to trial by jury; (b) the sentences violate the penological goals of the Illinois Constitution of 1970.

The defendant's contention that proof of guilt beyond a reasonable doubt is lacking in this matter initially concerns the question of Utinans' presence during the commission of the offenses. The argument suggests that because the only evidence locating the defendant at the scene of the crimes is the testimony of the complaining witness, grave doubt remains that Utinans participated in the offenses.

■■ We recognize the special duty which courts of review have in carefully reviewing the evidence in cases involving rape; however, this duty does not require or permit us to substitute another view of the weight or credibility of evidence for that of the triers of fact. Only if the evidence is "so palpably contrary to the finding or so unreasonable, improbable or unsatisfactory as to cause reasonable doubt as to the guilt of the accused" may this court set aside the verdicts of the jury. *People v. Reese* (1973), 54 Ill. 2d 51, 58, 294 N.E.2d 288, 291.

■■ While Officer Sesso's testimony tends to impeach the credibility of the complaining witness' version of the events of October 16 and 17, 1971, such evidence does not require the jury to disbelieve the victim's testimony. This is especially true when the "impeaching" testimony relates to matters testified to at trial and omitted from the victim's original statements to the police, yet not inherently contradicting the original statements. The defendant would have us evaluate the effect of Sesso's recollection of the original police interview as necessarily rendering the victim's testimony incredible. This we cannot do. The failure of the victim, within a matter of a few hours of traumatic sexual assaults, to recall infallibly and relate to the police every detail, description and

observation does not render her later recollection of a more complete version of the events implausible. Because of the nature of the assaults and the lack of sleep, discrepancies which exist between her original statements to the authorities and her trial testimony are understandable. Such differences as exist between the two versions go only to the weight given the testimony by the triers of fact. *People v. Henderson* (1976), 36 Ill. App. 3d 355, 344 N.E.2d 239.

■■■ The victim herein positively identified Utinans as one of her assailants at a lineup conducted only three days following the commission of the offenses. Moreover, she persisted in this identification and at trial again positively identified the defendant as having participated in the assaults. While corroborating evidence also exists in the form of medical stipulations and prompt complaint, in order for the jury to convict it is only necessary that there be a single eyewitness against the accused, provided the witness is credible and her testimony positive. This is true even though the testimony is contradicted by the accused or, as is the case here, impeached through the introduction of evidence concerning the witness' prior statements (*People v. Hampton* (1969), 44 Ill. 2d 41, 253 N.E.2d 385; *People v. Novotny* (1968), 41 Ill. 2d 401, 244 N.E.2d 182.) On the record before us the jurors, as the triers of fact, could make a finding, beyond all reasonable doubt, that Utinans was present during the commission of the offenses.

Utinans also contends that even if he was shown to be present by the requisite degree of proof, the record fails to establish his knowing participation in the commission of the offenses. The contention is addressed solely to the insufficiency of the proof as to the required mental state. The defendant suggests that even if he had sexual relations with the victim it does not necessarily follow that he knew the acts were performed contrary to the will of the victim.

We are concerned with whether or not the evidence establishes the *mens rea* beyond a reasonable doubt. (See Ill. Rev. Stat. 1975, ch. 38, par. 4—3.) The mental state required to be established depends upon the statutory definition of the offenses. Neither rape nor deviate sexual assault are defined as requiring proof of any particular mental state. (Ill. Rev. Stat. 1975, ch. 38, pars. 11—1, 11—2, 11—3.) Thus, for these crimes "any mental state defined in sections 4—4 [intent], 4—5 [knowledge], or 4—6 [recklessness] of the Criminal Code is applicable." (*People v. Marchese* (1975), 32 Ill. App. 3d 872, 882, 336 N.E.2d 795, 804; see also Ill. Rev. Stat. 1975, ch. 38, pars. 4—3 to 4—6.) The State need only prove general intent to satisfy the *mens rea* of rape and deviate sexual assault (see *People v. Gold* (1967), 38 Ill. 2d 510, 232 N.E.2d 702, *cert. denied* (1968), 392 U.S. 940, 20 L. Ed. 2d 1400, 88 S. Ct. 2317). Furthermore, kidnapping aggravated by the commission of rape is defined as requiring proof of

knowledge, a particular form of general intent. Ill. Rev. Stat. 1975, ch. 38, pars. 10—1(a), 10—2(a)(3).

■■ Unless admitted by a defendant, general intent (knowledge) necessary to support convictions for rape, aggravated kidnapping and deviate sexual assault must be established as a fact through circumstantial evidence. (*People v. Marchese.*) As in the review of all questions of fact, the inquiry of the court concerning the requisite establishment of the mental element is limited. We need only consider if there is evidence from which the jury could find that the defendant acted knowingly. *People v. Faginkrantz* (1960), 21 Ill. 2d 75, 171 N.E.2d 5.

Utinans contends that since he arrived at the garage after the victim had been abducted, brought there and forced to lie naked and blindfolded upon the burlap bags, this is enough to preclude his convictions since he could not have participated in the abduction or the threats. Lack of involvement in the abduction or threats, however, does not establish freedom from knowledge regarding his own conduct. The defendant would have us believe that he did not know the victim was being held against her will. Moreover, he would have us consider the victim's lack of resistance to his own sexual advances as indicative of his lack of knowledge that she was not consenting.

That the victim's lack of resistance requires a reversal of the rape and the deviate sexual assault convictions rests upon the misinterpretation of the law enunciated in *People v. Scott* (1950), 407 Ill. 301, 305-06, 95 N.E.2d 315:

> "It is a fundamental rule in such cases that in order to prove the charge of forcible rape there must be evidence to show that the act was committed by force and against the will of the female, and if she has the use of her faculties and physical powers the evidence must show such resistance as will demonstrate that the act was against her will. [Citations.] It is also fundamental that voluntary submission by the female, while she has power to resist, no matter how reluctantly yielded, amounts to consent and removes from the act an essential element of the crime of rape."

(See also *People v. Borak* (1973), 13 Ill. App. 3d 815, 301 N.E.2d 1.) *Scott,* however, assumes that the victim is able to resist, that resistance would not be foolhardy, and that resistance alone would be indicative of lack of consent. As this court has recognized on several occasions, resistance per se is not an essential ingredient of rape or deviate sexual assault:

> "In a conviction for rape [or deviate sexual assault], while the evidence must prove that the act was against the will of complainant, there is no definite standard for determining the amount of resistance required. Such a determination must be made

from the facts and circumstances of each case. [Citation.] Resistance and outcry are unnecessary, however, where the victim is restrained by fear of violence or where such acts would be futile and endanger the life of the female."

*People v. Montgomery* (1974), 19 Ill. App. 3d 206, 210, 311 N.E.2d 361, 364; see also *People v. Griggs* (1970), 131 Ill. App. 2d 257, 266 N.E.2d 398; *People v. Strong* (1970), 120 Ill. App. 2d 52, 256 N.E.2d 76; *People v. Ware* (1973), 11 Ill. App. 3d 697, 297 N.E.2d 289 (rape and deviate sexual assault).

■■ The victim testified that after she was carried to the car:

A. "I tried to get out and he pushed me back down and told me that if I wouldn't move I wouldn't get hurt and that he had a knife."

While this testimony relates to the conduct of Michael during the abduction, it establishes a basis for fear which later operates to excuse further resistance. Such a fear certainly would not diminish as the victim became aware that at least four men were holding her instead of only the original two. See *People v. Browder* (1974), 21 Ill. App. 3d 223, 315 N.E.2d 168.

■■ It is from the totality of the evidence that the requisite mental state can be inferred by reasonable men and women. We believe that a jury could have found the defendant to have acted with knowledge. We believe that a reasonable man would be aware of the confinement of the victim and of her unwilling submission to the various sexual acts under the circumstances of this case.

Our decision affirming the establishment of the mental state need not rest upon circumstantial evidence alone. The defendant's own words, related in the testimony of the victim, demonstrates an awareness of wrongful conduct. Following his unsuccessful attempt to engage the victim in anal intercourse, Utinans told her that "they [the assailants] were the ones who were bad * * *." Such language can only be interpreted to mean that the defendant knowingly offended the victim.

The defendant next contends that the evidence fails to support convictions for aggravated kidnapping and deviate sexual assault. Utinans argues that the underlying kidnapping charge is not substantiated because of the lack of evidence placing him at the scene of the abduction and the failure of the court to instruct the jury regarding accountability for the conduct of the co-defendants. Deviate sexual assault is not supported, he contends, because the contact of his penis and the victim's mouth is not established beyond a reasonable doubt. It is our view that the aggravated kidnapping conviction does not rest upon Utinans' accountability for the conduct of the co-defendants, nor does it depend

upon the defendant's participation in the abduction of the victim. Rather, conviction is grounded upon the defendant's knowing secret confinement of the victim against her will and the commission of rape upon her in the course of the confinement. Ill. Rev. Stat. 1975, ch. 38, pars. 10—1(a)(1), 10—2(a)(3), 11—1.

■■ The defendant's theory that his only confinement of the victim consists of his lying upon her during an act of sexual intercourse and that this single act precludes conviction for both rape and aggravated kidnapping, ignores the totality of circumstances disclosed by the evidence. Where the facts demonstrate that a kidnapping and rape are not founded upon the same conduct, convictions for both rape and aggravated kidnapping are permissible. (*People v. Canale* (1972), 52 Ill. 2d 107, 285 N.E.2d 133; *People v. Patton* (1975), 25 Ill. App. 3d 840, 322 N.E.2d 592.) In this case confinement is shown as occurring both before and after, as well as during, the defendant's rape of the victim.

■■ Upon Utinans' arrival at the garage and his awareness that the victim was present against her will, the election to remain and participate in further confinement and in the sexual assaults is sufficient to hold him accountable.

■■ The argument that the following testimony fails to substantiate a conviction for deviate sexual assault founded upon oral copulation is not persuasive:

> "[Assistant State's Attorney on direct examination of the victim.]
>
> Q. After the conversation with Guntis Utinas [*sic*] did he do anything else at that time?
>
> A. Yes, he did.
>
> Q. What did he do?
>
> A. Then he forced me to have oral intercourse with him.
>
> Q. By that what do you mean?
>
> A. I mean that he put his penis by my mouth.
>
> Q. Did it touch your mouth?
>
> A. Yes, it did."

Contrary to the suggestion of the defendant, the offense of deviate sexual assault does not require that there be penetration of the oral or anal cavity; however, contact is a necessary element of the offense (*People v. Oliver* (1976), 38 Ill. App. 3d 166, 347 N.E.2d 865; *People v. Anderson* (1974), 20 Ill. App. 3d 840, 314 N.E.2d 651). We believe that the testimony is sufficient to support a finding that the defendant had contact with the victim. This finding combined with the elements of force and knowledge is all that is necessary to sustain the conviction.

Even admitting the sufficiency of the act to sustain a finding of oral copulation, the defendant alleges that the instructions to the jury

regarding deviate sexual assault were misleading. The objection is to the reference of both oral and anal forms of deviate sexual conduct where the indictment is for only the oral form. The harm is alleged to arise from the evidence which related Utinans' attempted anal intercourse with the victim. With this in mind, the jury might very well have concluded that the attempted anal intercourse was relevant to the charge.

Since no objection was presented to the trial court concerning the instruction for deviate sexual conduct, the State recommends that we treat the matter as having been waived under the authority of *People v. Mallett* (1970), 45 Ill. 2d 388, 259 N.E.2d 241. We are of the opinion that this issue has been waived unless it is encompassed by the ambit of Supreme Court Rule 451(c) (Ill. Rev. Stat. 1975, ch. 110A, par. 451(c)) which provides that "substantial defects [in instructions] are not waived by failure to make timely objections thereto if the interests of justice require." In *People v. Rosochacki* (1969), 41 Ill. 2d 483, 244 N.E.2d 136, a case which considered the propriety of instructing the jury on theories of murder not charged in the indictment, the supreme court noted:

> "We find that the defendant here was charged with murder and convicted of that crime, and even if a variance did exist between the type of murder charged in the indictment and the types described in the instructions, it would not vitiate the conviction *unless it was of such a character as to mislead the defendant in his defense or expose him to double jeopardy.*" (Emphasis added.) 41 Ill. 2d 483, 492.

■■ We believe that the instruction which was given did not mislead the defendant in his defense nor expose him to double jeopardy. Therefore, we hold that no substantial defect exists regarding the instruction on deviate sexual conduct. Because the jury's verdict of guilty on the deviate sexual assault charge is fully supported by the evidence as to oral copulation, we will not disturb that finding.

The defendant's next contention concerns the failure of the State to preserve the cassette tape recording of interviews with the victim conducted during the early morning hours of Sunday, October 17, 1971. It is Utinans' position that spoliation of this evidence deprived him of effectively presenting a defense based upon the impeachment of the victim's testimony concerning his participation in the offenses. While it is not suggested that the recording would demonstratively exculpate the defendant, it is suggested that it would substantiate, in the victim's own voice, the testimony of Officer James Sesso that the victim failed in her original statements to account for the participation of the defendant.

Without sanctioning the inefficiency responsible for the loss of the cassette tape, we are of the opinion that no serious harm has resulted from

its nonproduction. Furthermore, the record fails to support the defendant's prime inference that there has been a spoliation (intentional destruction) of the cassette.

The effect of exculpatory statements in the complaining witness' own voice would be apparent; however, it is unlikely that the defendant would gain any advantage by having the tape played for the jury in order to corroborate Sesso's recollection of what the victim did not say. In view of the victim's recollection of having accounted for Utinans' participation in the offenses during some part of her lengthy interview, it would not be possible to excise portions of the dialogue to demonstrate the nonexistence of the accounting. The entire tape would have to be played. Under Sesso's recollection of the interview, this procedure might benefit the State's case as much as, if not more than, the defendant's. The defendant failed to introduce into evidence the typewritten summary of the recorded interviews. Therefore, it may be inferred that even if the tape was available, the defendant may not have introduced it into evidence.

■■ The defendant, nevertheless, cites several cases for the proposition that the State's failure to preserve possible exculpatory evidence requires dismissal of the prosecution or reversal of the convictions upon appeal (see *United States v. Bryant* (D.C. Cir. 1971), 439 F.2d 642; *People v. Howze* (1971), 1 Ill. App. 3d 253, 273 N.E.2d 733; see also *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194). Each of these cases, however, requires the showing of something more than is present in the case before us. In addition to a showing of exculpatory quality the cases have required a demonstration of the existence of the evidence at the time of the trial or the intentional failure of the prosecution to preserve and produce the evidence. *People v. Steptoe* (1976), 35 Ill. App. 3d 1075, 1079, 343 N.E.2d 1, 4, recognized the possibility that "[t]here may be instances where due process would require a new trial if the police lost confiscated evidence through their negligence * * *." We also recognize the possibility that there may be instances in which the negligent loss of transcripts or recordings of witnesses' statements would require the imposition of sanctions. Nevertheless, the facts of this case do not warrant such sanctions. The testimony of Officer Sesso and the availability of the written summary of the interviews provided the defendant with sufficient substitutes for the missing tape.

The argument that the testimony of several police officers relating to the investigatory procedures culminating in the arrest of Guntis Utinans is hearsay and violative of the confrontation rights of the defendant is without merit. Officer Philip Nuccio testified that on October 19, 1971, which was after the victim had filed complaints with the Police

Department, he arrested Michael Briseno in the company of another man pursuant to a traffic offense. Nuccio indicated that Michael was turned over to Officers James Carroll, Daniel Kepp and Samuel Louis for questioning.

Officer Carroll testified that following his interrogation of Michael he went to an office of the Illinois Bell Telephone Company and arrested Richard Briseno. He then related that he proceeded to an address on the North Side of the City of Chicago where an automobile matching the description of the one used in the abduction of the victim was discovered. A "license applied for" sticker affixed to the windshield of his vehicle indicated that it was registered to Paul DiMartino. The vehicle was driven to Area 5 police headquarters.

Officer Daniel Kepp then testified that he effected the arrest of Utinans at a North Side address. He further stated that Utinans was turned over to Officers Samuel Louis and George Ruckrich for investigation.

The defendant describes the above related testimony as leaving little room for doubt that something said by one or more of the co-defendants resulted in his being arrested for the offenses which are the subject of this appeal. So characterized the testimony is claimed to amount to nothing more than impermissible hearsay. The State's response to this argument stresses the importance of demonstrating to the trier of fact the circumstances accounting for the arrest of a person brought to trial on criminal charges. The State denies the clarity of the inference upon which the defendant labels the testimony as an impermissible hearsay.

In *People v. Wright* (1974), 56 Ill. 2d 523, 309 N.E.2d 537, the court accepted as clear an inference identical to that suggested by the present defendant; nevertheless, the opinion in *Wright* noted the ability of the defendant to challenge or clarify the inference through cross-examination of a co-defendant who had already been convicted in a separate proceeding. But see *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620.

The recent decision in *People v. Byrd* (1976), 43 Ill. App. 3d 735, 357 N.E.2d 174, applied the principle of the *Wright* case in holding that the ability to bring already convicted accomplices into court for cross-examination defeated a confrontation clause challenge to testimony revealing the steps taken to effect the arrest of the defendant following interrogation of the accomplices. The *Byrd* court further noted that with respect to the hearsay problem the police properly testified only to what they did and that they refrained from relating the substance of conversations had with the accomplices.

■■ Nothing in the record of the instant case suggests that Utinans was prevented from bringing his alleged incriminators, Michael and Richard Briseno (who had already been convicted on the same charges

for which Utinans was on trial) into court for cross-examination. Likewise, the police officers herein related only what they did and not what they said or heard in the course of conversations with the co-defendants (see also *People v. Coleman* (1974), 17 Ill. App. 3d 421, 308 N.E.2d 364). Under these circumstances the damage caused, if any, by inferences of incrimination must be outweighed by the importance of allowing the State to account for the arrest of the defendant. *People v. Byrd.*

The defendant's next contention concerns the testimony of the complaining witness' mother. We are urged to characterize this testimony as containing matters of hearsay violative of the confrontation clause of the Federal Constitution. The defendant failed to raise this issue in his motion for a new trial and has, therefore, waived it upon this appeal. *People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856.

During the direct examination of Officer Samuel Louis, the State attempted to lay a foundation for the admission of a copy of the defendant's typewritten statement into evidence. As a result of this attempt, the jury was informed that Utinans admitted to knowing the co-defendants and to having ridden around with them on prior occasions, particularly on September 7, 1971, "on the night Rosemary T_____." The defendant complains of the erroneous and prejudicial effect which the jury's exposure to this information had, especially in view of the trial court's order denying the admissibility of the statement itself. This contention is based on the rule which generally forbids the admissibility of criminal conduct other that that for which an accused is being tried. The State counters by claiming that the court erred in refusing to admit the statement into evidence. The information elicited was in the State's view admissible under the common scheme of conduct exception as tending to establish the identity and mental state of the defendant. *People v. Manzella* (1973), 56 Ill. 2d 187, 306 N.E.2d 16.

■■ We do not decide the propriety of the trial court's order denying the admissibility of the written statement as such; however, the limited amount of information here complained of was not erroneously elicited (*People v. Dewey* (1969), 42 Ill. 2d 148, 246 N.E.2d 232). The information heard by the jury at best contains only an implication of prior criminal conduct. Nothing has been revealed concerning the identity of Rosemary T. or what happened on September 7. Moreover, the matter of Utinans' prior associations with the co-defendants was extremely relevant to the issues of his identity and mental state in connection with the charges for which he was tried.

■■ The next issue concerns the ability of the defendant to present his theory of the case to the jury. He argues that the trial court denied this opportunity by refusing to instruct the jury properly on the impeachment

of the complaining witness' testimony. For this purpose the defendant had tendered the following instruction which was objected to by the State and refused by the court:

> "Evidence that on some former occasion [the victim] made a statement, or statements, inconsistent with her testimony in this case, may be considered by you in deciding the weight to be given to her testimony."

The record discloses that the instruction which ultimately was given was a co-operative effort of both the defendant and the State; furthermore, it was given without objection.

> "Evidence that on some former occasion a witness made a statement inconsistent with that witness' testimony in this case, may be considered by you in deciding the weight to be given to the testimony of that witness."

It is our view that the court correctly chose the more neutral statement of the law in giving the general instruction. *People v. Robinson* (1958), 14 Ill. 2d 325, 153 N.E.2d 65.

■■ The defendant also contends that he was denied the right to argue his theory of the case insofar as the court permitted the State to interrupt his closing argument with objections. Furthermore, he argues that the rulings on these objections were, for the most part, improper. While there were numerous interruptions during the closing argument of defendant's counsel, we find no indication in the record that the defendant's theory of the case was not allowed to be aired (*People v. Gallo* (1973), 54 Ill. 2d 343, 297 N.E.2d 569). Nor do we find the court's rulings on the objections to have been improper.

The defendant also argues that his right to a fair trial was abridged when the court ordered a portion of the defendant's cross-examination of the complaining witness stricken from the record in the presence of the jury immediately prior to the commencement of final arguments. The portion of the testimony stricken amounted to a single question and answer:

> "Q. I see. And, you know, did you accept a ride from some people who asked you to get into the car?
> A. No, I didn't."

Both parties agree that the question was intended to impeach the credibility of the victim; they both also appear to agree that the question was improperly asked upon cross-examination because it assumed facts not in evidence and failed to anticipate rebuttal in the event of the negative response. We are concerned, therefore, with the timing of the court's actions and with the method utilized to strike the improper matter from the record.

■■ In our view the matter was properly stricken from the record.

Only if there has been an unnecessary disparagement of counsel would we be justified in finding error in the timing of the court's actions. Nothing in the record before us, however, discloses disparagement. The court merely granted the State's motion to strike, ordered the matter stricken and instructed the jury to disregard it. Had the objection been raised at the time the matter was wrongfully elicited by defense counsel, the same method of curing the wrong would have been employed. Disparagement of counsel cannot be made out of judicial response which happens to be favorable to one party and against another. *Cf. People v. Allum* (1967), 78 Ill. App. 2d 462, 223 N.E.2d 187.

■■ The next contention concerns the conduct of the prosecutor in the course of the closing arguments. Defendant complains of numerous instances of name-calling, reference to matters not in evidence, statements of personal belief regarding the complaining witness' veracity, reliance upon the notion of guilt by association and implications of the defendant's engagement in other criminal conduct. For the most part, none of the alleged instances of error were objected to at trial; consequently, these contentions are waived. (*People v. Scott* (1974), 23 Ill. App. 3d 956, 320 N.E.2d 360.) Those few instances which were adequately preserved for appeal do not require detailed analysis since we find no prejudice arising from their presence in the record. In light of the evidence of guilt which was presented in this matter, nothing said during the closing arguments of the State's counsel is seen as having unduly influenced the result reached by the jury. See *People v. Koshiol* (1970), 45 Ill. 2d 573, 262 N.E.2d 446.

Because we have found no errors in any of the above contentions, we reject the argument that the combined effect of numerous trial errors requires reversal of this cause. Hence, we will address the final contention presented by this appeal, that the sentences imposed upon Guntis Utinans are illegal and excessive.

The trial judge who sentenced Utinans on his convictions for rape, aggravated kidnapping and deviate sexual assault, is the same judge who sentenced the co-defendants, Michael and Richard Briseno, upon their pleas of guilty. The claim put forth is that the defendant was penalized for exercising his right to trial by jury in that he was given concurrent terms of 15 to 30 years on each count, while the Brisenos were sentenced to concurrent terms ranging from 7 to 20 years to 5 to 14 years for the same offenses. The record indicates that Utinans' participation in the offenses was no greater than that of Michael, but that it was considerably greater than Richard's.

■■ ■ Our supreme court has held it to be constitutional error to penalize a defendant for exercising the right to trial by jury. (*People v. Moriarty* (1962), 25 Ill. 2d 565, 185 N.E.2d 688; see also *United States v.*

*Wiley* (7th Cir. 1960), 278 F.2d 500.) This court has also recognized that proof of such a penalty need not appear explicitly in the recorded remarks of the sentencing judge. The penalty also *may be inferred* from the length of a sentence imposed upon a defendant who is convicted after trial as compared with a sentence given by the same judge to a similarly involved co-defendant upon the latter's plea of guilty. (*People v. Jones* (1969), 118 Ill. App. 2d 189, 254 N.E.2d 843.) However, such an inference is not compelled, and we do not infer that the defendant in this case has been unlawfully penalized for the exercise of a constitutional right. Rather, it is our view that the sentences imposed herein are fully justified by the evidence adduced at trial and the total lack of remorse on the part of the defendant. See *People v. Morgan* (1975), 29 Ill. App. 3d 1043, 332 N.E.2d 191.

We also find no abuse of discretion as to the length of the sentences with respect to the mandate of the Illinois bill of rights requiring that all sentences be related both to the nature of the offense and the objective of restoring the offender to useful citizenship (Ill. Const. 1970, art. I, §11). The penalties imposed herein are well within the statutory limits and will not be disturbed unless greatly at variance with the purpose and spirit of the law or manifestly in excess of the proscriptions of our constitution. *People v. Fox* (1971), 48 Ill. 2d 239, 251, 269 N.E.2d 720.

For the foregoing reasons the judgment of the Circuit Court of Cook County is affirmed.

Affirmed.

McNAMARA and JIGANTI, JJ., concur.