THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* CARLOS BRUNO, Defendant-Appellant.

First District (4th Division)   No. 77-404

Opinion filed February 1, 1979.

Ralph Ruebner and Kathy M. Morris, both of State Appellate Defender's Office, for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, James S. Veldman, and Kathleen M. McGury, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE JIGANTI delivered the opinion of the court:

Following a bench trial in the circuit court of Cook County, the defendant, Carlos Bruno, was found guilty of voluntary manslaughter and sentenced to a term of 5 to 15 years. The defendant's first trial, on a murder charge, resulted in a mistrial. His second trial resulted in a guilty verdict on the charge of voluntary manslaughter, but the defendant's motion for a new trial was subsequently granted. The defendant now appeals from the guilty finding rendered at the close of his third trial. On appeal, the defendant argues (1) the State's evidence did not justify a finding of guilty of voluntary manslaughter and the basis for his conviction was legally erroneous in that the court made an inconsistent finding that he was guilty of both types of voluntary manslaughter; (2)

that loss or destruction of material evidence by the State, which was favorable to and requested by the defendant, violated his due process rights; and (3) that the trial court acted in an arbitrary manner in denying the defendant probation and abused its discretion in failing to consider any of the mitigating factors advanced by the defendant.

Gilberto Jiminez was the first witness for the State. Jiminez testified he was at the Newport Restaurant at 2726 West North Avenue in the City of Chicago at approximately 5:30 a.m. on March 28, 1971. He saw the defendant enter the restaurant with two women. One of the women said hello to Hector Herrera who was sitting at a table with the deceased, Felipe Trinidad. The defendant pulled the woman away and the three of them continued to the rear of the restaurant. Shortly thereafter, Herrera and the decedent walked to the cash register and were "kidding" about the bill when the defendant approached them and told the cashier to let him know "if anything happened there." The cashier and the decedent told the defendant that nothing was happening. Jiminez testified that the defendant then tried to slap the decedent, a struggle commenced between them, and they fell to the floor as Herrera tried to break it up.

Jiminez testified that the defendant got up from the floor first, stepped back three or four feet, and pulled out a gun. The defendant shot his gun twice towards the front of the restaurant. Jiminez was wounded in the leg by the second shot and he left the restaurant. When the witness last saw the defendant that night the defendant was trying to make a phone call. Jiminez also testified that he spoke to the defendant at a nightclub in August, 1971. At that time the defendant said he would pay him $3,000 to testify in his favor.

On cross-examination Jiminez said he had not met the defendant prior to the shooting and had not known the defendant was a policeman. He was impeached on the basis of testimony from the first trial where he said he knew the defendant was a policeman. Jiminez' testimony was conflicting as to whether he could see Herrera when the decedent and the defendant were on the floor and as to whether he could see Herrera kicking the defendant.

Abigail Perez' testimony was essentially the same as that of Jiminez. She was at the Newport Restaurant the night of the shooting. She had gone to the ladies' room and when she returned she saw the defendant standing in an aisle pointing a gun at the ceiling. She ducked down and heard two shots fired. After hearing a third shot, she left the restaurant with her friends. She saw the decedent holding his stomach and helped him out the door. Perez saw Nellie Bonano approach the defendant and ask him why he killed the decedent. The defendant kicked her. The defendant was making a phone call at that time. Perez did not know that the defendant was a police officer. Perez went to the hospital after the

police arrived and while there saw the defendant make a motion of rubbing his finger across his throat from ear to ear while looking at her and her friends.

On cross-examination Perez said she did not know if Bonano had been pushed or kicked by the defendant as she had only seen her fall.

Rose Lopez' testimony was essentially the same as Jiminez' concerning the initiation of the altercation at the cashier's counter. She was unable to see the two men on the floor but did see Herrera try to pull the decedent off the defendant. She then saw the defendant point a gun at the ceiling and fire a shot. The defendant approached the decedent, put his left arm around the decedent's neck and had his gun pointing towards the decedent's stomach. The defendant fired two more shots. Lopez was unable to see the decedent's hands at that time. The defendant waved his gun around and then went to the telephone. Lopez left the restaurant and Bonano, who left with her, went back inside, said something to the defendant and called him "dirty names." The defendant shoved her to the ground. The defendant came over to where Lopez was kneeling near the decedent and told her to get up or he would shoot. She got up but then returned to get her purse and the defendant pushed her. Lopez did not know the defendant was a policeman until someone screamed that fact after the shooting. Lopez also testified to the gesture the defendant made at the women while they were at the hospital.

Marten Muriel testified that he, too, was at the Newport Restaurant the night of the shooting. Muriel said the decedent had not touched the defendant before the defendant slapped the decedent. Muriel also testified that when the decedent told the defendant that the conversation with the cashier was none of his business, the defendant's response was "Don't get smart with me or I break your ass right now." The decedent asked the defendant to step outside with him and it was at that point that the defendant turned around and slapped the decedent. Muriel also testified that the decedent grabbed the defendant's gun hand before he was shot.

On cross-examination Muriel testified that he did not see the decedent punching the defendant while the decedent was on top of the defendant. He was impeached by his prior testimony from the first two trials where he said the decedent had in fact punched the defendant two or three times while on top of him. Muriel also testified that the decedent had his hand on the defendant's hand, but not on the gun. He was again impeached on the basis of his testimony from the first trial where he said the decedent did have his hand on the gun.

Another eyewitness, Jose Nelson Antonetty, testified for the State. His description of the events surrounding the shooting was essentially the same as that of the other State's witnesses. In addition, he testified that the

decedent hit the defendant after the defendant tried to hit the decedent and that the first shot was fired straight ahead rather than into the ceiling.

The witnesses for the defense were Mary Taylor Khollman and the defendant himself. Khollman accompanied the defendant and Frances Torres to the Newport Restaurant on the night of the shooting. She did not see the defendant from the time he left their table to go to the cashier's counter until she saw him on the floor with the decedent on top of him, punching him. Khollman testified there were four or five men, including Herrera, standing around and kicking the defendant while the decedent was on top of him. When the defendant got up from the floor he pulled his gun out, announced he was a police officer and told all of them to leave. He then fired a shot into the ceiling. The decedent went towards the defendant and they began struggling again. The decedent grabbed the defendant's wrists. Two to four shots were fired as the two men struggled.

On cross-examination Khollman's testimony from the first trial was introduced, at which time she said she did not remember what Herrera was doing when he was standing near the defendant.

The defendant testified that after the cashier told him there was no trouble, he was returning to his seat when Khollman yelled "Watch it, Bruno." He turned around and saw the decedent reaching for him. The defendant took a swing at the decedent to prevent the decedent from hitting him, but the decedent blocked the blow and hit the defendant in the face, knocking him to the floor. The decedent sat on the defendant's stomach, punching him in the face, while seven or eight other men were kicking the defendant. The defendant heard Herrera say "Kill him. He's a pig. He's a policeman." He felt someone grabbing for his gun and his left pants pocket, near where his revolver was tucked into his waistband, was torn. The defendant then got up, fired a warning shot, showed his badge and announced he was a policeman. He told everyone to leave the premises or they would be arrested. The decedent kept charging at him and grabbed his wrists. They began struggling over the gun while Herrera and Antonetty threw punches at the defendant. The decedent put pressure on the defendant's arm and fingers and the gun went off. Each time the defendant tried to move the gun in a different direction the gun would go off again. The last time it discharged, the decedent fell to the ground. The defendant said he had not intentionally shot the decedent.

On cross-examination the defendant said he remembered having his badge in his hand when the responding officers arrived, but that he had not had it out during the fight. He said he had never had his left arm wrapped around the decedent's neck.

On rebuttal, Assistant State's Attorney Gino DeVito testified that he had spoken with Khollman during his investigation of the shooting and that she told him she was the fiance of the defendant.

The defendant's exhibits included a photograph showing a bullet hole in the ceiling of the Newport Restaurant. It was stipulated that if Dr. Jerry Kern of the Cook County Coroner's office were called he would testify that he had examined the decedent and believed the cause of death to be a bullet wound to the abdomen.

On appeal, the defendant first argues the State's evidence proved neither theory of voluntary manslaughter. The trial court found that the defendant was guilty of both types of voluntary manslaughter, one of which involves a situation where the trier of fact concludes that the defendant unreasonably believed the shooting was justified (Ill. Rev. Stat. 1971, ch. 38, par. 9—2(b)); the other encompasses actions taken "under a sudden and intense passion resulting from serious provocation * * *." (Ill. Rev. Stat. 1971, ch. 38, par. 9—2(a).) The defendant argues that he could not be guilty of the former because the State's evidence showed that he precipitated the altercation, and that he could not be guilty of the latter because there was not sufficient provocation. The defendant submits he may have been guilty of intentional murder, but he was not guilty of voluntary manslaughter.

█■■ We cannot accept this argument. The witnesses for both parties were in agreement that the defendant and the decedent were engaged in physical combat when the fatal shot was fired. The law in Illinois is clear that mutual quarrel or combat is sufficient to support a finding of serious provocation (*People v. Johnson* (1972), 4 Ill. App. 3d 249, 280 N.E.2d 764), as required under section 9—2(a) of the Illinois Criminal Code of 1961 (Ill. Rev. Stat. 1971, ch. 38, par. 9—2(a)). The evidence was also sufficient, had the defendant's witnesses been believed, to support a finding that the defendant unreasonably believed that the shooting was justified under section 9—2(b). (Ill. Rev. Stat. 1971, ch. 38, par. 9—2(b).) The defendant testified that he swung at the decedent only to prevent the decedent from hitting him; that the defendant was then knocked to the ground; that the decedent punched him in the face while others kicked him; that someone tried to grab his gun; and that the gun went off while the decedent was grappling with him.

█■ The defendant additionally argues that the trial judge's findings of guilt were inconsistent and cannot be allowed to stand. The trial judge concluded that the defendant was guilty of both types of voluntary manslaughter. As the defendant points out, and the State concedes, the two theories of voluntary manslaughter require different frames of mind and cannot both be present in the same act. *People v. Clark* (1973), 15 Ill. App. 3d 756, 305 N.E.2d 218.

While it is true that the defendant could not have possessed two different frames of mind at the time of the shooting, a frame of mind can only be inferred from the evidence presented at trial. Because the

evidence supports either frame of mind, it makes little difference whether the court found that at the time of the shooting the defendant was acting under an intense passion or under an unreasonable belief that the shooting was necessary.

The defendant next argues that the loss or destruction of the defendant's and decedent's clothing and resulting non-production of this evidence by the State, deprived him of his right to due process. The defendant argues this clothing was material to his affirmative defense of accidental shooting and reasonable belief in self-defense. More particularly, the defendant urges the clothing would have lent credence to his claims that the fatal shot was not intentionally fired at point blank range and that his pants pocket was torn when the decedent attempted to get his gun during the struggle.

The defense requested the clothing in its discovery motion prior to the defendant's first trial. At that time the State indicated it had the clothing. Before this trial commenced the State told the defendant the clothing could not be located. The defense renewed its request for the clothing during trial. The State said it was clear that it had the defendant's clothing at the time of the first trial but that there was no indication that they had ever had possession of the decedent's clothing. The State said it had conducted an extensive search for the clothing and had located a court order directing the destruction of the defendant's clothing in 1974. That order was not introduced into evidence. The court denied the defendant's motion to dismiss the indictment based on the unavailability of the clothing.

In *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194, the United States Supreme Court held the suppression by the government of evidence favorable to an accused violates due process if the evidence is material to guilt and is requested by the defendant, irrespective of the good or bad faith of the prosecution. The Illinois Supreme Court further explained this rule of law in *People v. Nichols* (1976), 63 Ill. 2d 443, 446, 349 N.E.2d 40, 42-43:

> "For there to have been a violation of the right to due process, it must be shown that the evidence was suppressed following a request for it by the defendant, that the evidence was favorable to the defendant, and that it was material."

We cannot say that the defendant's due process rights have been violated by the inability of the State to produce the requested clothing. In *People v. Utinans* (1977), 55 Ill. App. 3d 306, 320, 370 N.E.2d 1080, 1090, the court noted: "In addition to a showing of exculpatory quality the cases have required a demonstration of the existence of the evidence at the time of the trial or the intentional failure of the prosecution to preserve and produce the evidence." That case concerned the loss of a cassette tape recording by the State. The court found that the testimony of the police

and the availability of written summaries of interviews constituted sufficient substitutes for the missing tape. We believe the several eyewitnesses to this shooting, who testified at the most recent trial, provided sufficient substitutes for the missing clothing of the defendant and the decedent. Even if we accept the defendant's contentions that the pants would show a ripped pocket and that the decedent's clothing would show that the fatal shot was fired at close range, more than a single inference could follow. These contentions, if confirmed, would not necessarily be favorable to the defendant. The pants pocket could have been torn in the struggle and need not indicate that the decedent, as the defendant contends, was attempting to remove his gun. And whether the gun was shot at close range does not negate a finding of voluntary manslaughter.

■ We believe the unavailability of the clothing did not violate the defendant's due process rights. First, there is no evidence that the clothing was deliberately suppressed by the State. Second, assuming the clothing was as described by the defendant, the inferences he attempts to draw could as well have been drawn from the eyewitness testimony. And, finally, these inferences would not necessarily be exculpatory.

The defendant's final argument is that the trial court acted in an arbitrary manner in denying him probation and that the court abused its discretion in failing to consider any of the mitigating factors advanced by the defendant at the hearing in mitigation.

■ The scope of review from denial of an application for probation is limited to a determination of whether the trial court exercised its discretion in sentencing the defendant or whether that discretion was abused by some arbitrary action. (*People v. Honn* (1977), 47 Ill. App. 3d 378, 362 N.E.2d 90.) At the defendant's hearing in aggravation and mitigation the defense counsel made his argument concerning mitigating factors. Those comments are contained in the record before us. The trial judge, however, emphasized the factors in aggravation in sentencing the defendant to a term of years in the penitentiary. We cannot say he abused his discretion in denying the defendant his request for probation. Neither the statutes nor the cases contain any requirement that the trial judge's consideration of the factors in mitigation be made expressly and as a part of the record. Because the defense counsel's argument is found in the record, we must assume that the trial judge gave due consideration to it in imposing sentence.

For the foregoing reasons the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

JOHNSON and LINN, JJ., concur.