THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JOSEPH PAVIC, Defendant-Appellant.

First District (5th Division)    No. 80-1307

Opinion filed February 11, 1982.

Patrick A. Tuite and David S. Mejia, both of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr and Kevin Sweeney, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WILSON delivered the opinion of the court:

Following a jury trial, defendant was convicted of rape, deviate sexual assault, robbery, burglary, and home invasion. (Ill. Rev. Stat. 1979, ch. 38, pars. 11—1, 11—3, 18—1, 19—1, and 12—11, respectively.) The trial court sentenced him to serve three 25-year prison terms and two 14-year terms, to run concurrently. On appeal, defendant contends that (1) by erroneously admitting *"modus operandi"* evidence that defendant

had committed two other rapes, the trial court denied defendant a fair trial; (2) because the State failed to prove the elements of robbery and home invasion, the convictions on those counts must be reversed and the defendant resentenced; (3) the court erred in tendering to the jury five "guilty" verdict forms and only one "not guilty" form, which may have confused the jury; and (4) newly discovered evidence requires that defendant be granted a new trial.

Defendant was indicted for the rapes of three women, C.R., K.K., and G.S. The prosecutors elected to try defendant on the third indictment only and to call the other two women as witnesses for the prosecution. In a pretrial motion *in limine* defendant sought to bar the testimony of the other two alleged rape victims. The trial court denied the motion, holding that the evidence was admissible to show defendant's *modus operandi* or identity.

The trial began on February 4, 1980. The complaining witness, G.S., testified as to the events of February 16, 1979, when she was raped in her apartment. After leaving work at 5 p.m., she stopped at a grocery store two blocks from her home. She arrived at her second floor apartment in the 1300 block of West Greenleaf in Chicago at 7 p.m. After showering, dressing, and straightening the apartment she began to cook dinner. She partially opened her back door because the kitchen had become warm. Approximately 15 minutes later the electricity in her apartment went off. She then went upstairs to a neighbor's apartment and her neighbor accompanied her to the basement where they found that two electrical circuit breakers were in the "off" position. After returning to her apartment, G.S. entered her bedroom and began to brush her hair. It was now about 8 p.m. Noticing a strong odor that smelled of stale clothes, she looked around for the source. As she approached the bedroom closet the door flew open and a man leaped out. G.S. later identified the man as defendant, and testified that she had a clear view of his face.

G.S. further testified that after he came out of the closet, defendant grappled with her and they travelled across the room until she fell on the radiator. Defendant fell on top of her and grabbed her throat, choked her, and told her to stop screaming or he would stab her. He also demanded money, which she said was in her purse. Defendant then pulled her up from the floor and threw her across the bed, where she lay on her back at a right angle to the normal sleeping position. Still choking G.S., defendant removed her jeans and pulled her shirt up. He also pushed a pillow over her face. Defendant then pulled down his own pants and had sexual intercourse with the victim for several minutes. During this time she pushed the pillow off her face several times. Next defendant stood, pulled G.S. up by the hair and neck, and forced her to perform fellatio on him. Afterward, he pushed her back on the bed on her stomach and again

forced her to have sexual intercourse for several moments. After he finished, he left her on the bed and went into the living room. She heard him rummaging around. He reentered the bedroom three times to say to the victim that he knew he had done something wrong and to ask if she would turn him in.

After defendant left, G.S. went to her neighbor's apartment to call the police. She discovered later that $35 in cash and a number of record albums were missing from her apartment. When police arrived she described her assailant as a white male in his early twenties, approximately 5'8", 120 pounds, with a full, round face, wearing a blue knit cap and a khaki jacket. Subsequently, she picked defendant's photograph from a book of photographs and also identified him in a lineup.

The physician who attended G.S. when she arrived in the emergency room of the hospital testified that she had appeared to be extremely agitated. Also, she had bruises, scratches, and abrasions on her body. The doctor further testified as to the results of a pelvic examination he performed on G.S. According to stipulated evidence, a smear taken from G.S. indicated the presence of spermatozoa in her vagina.

Police officers also testified as to their investigation of the February 16, 1979, occurrence and to their subsequent procedures relating to the photo identifications and lineups.

Next to testify was C.R., who related the circumstances of February 5, 1979, when she was raped in her apartment in the 1300 block of West Greenleaf. She left work at 5 p.m., stopped at the grocery store, and then returned to her apartment. She went into the bathroom to undress. She then heard a sound and saw a man enter her apartment through the door. She later identified this man as defendant. C.R. closed the bathroom door and grabbed a back brush to use as a weapon. Defendant forced his way into the bathroom and grabbed her around the throat. He also threatened to stab her, although he did not show her a knife. He then forced her into the bedroom and onto the bed. He held her on her back across the bed at a right angle to a normal sleeping position. After she refused to remove the thermal underwear she was wearing, he choked her again and pulled them off. He also fondled her and kissed her breasts. Defendant then unfastened his own pants and had sexual intercourse with her. Defendant fastened his pants and told C.R. to put the pillow over her head, but instead she pulled the covers up over her eyes. She heard him tell her to stay there. After about 20 seconds she heard defendant leave. Then she called her sister from a neighbor's apartment.

Subsequently, C.R. talked to police and identified defendant from photographs and a lineup. In her testimony at trial, she recalled that her attacker was 18 to 20 years old and wore a blue knit cap, a nylon jacket, and a blue T-shirt with the word "Superkid" across the front.

The State's final witness was K.K. She testified that on January 29, 1979, she left work at 5 p.m. and went to her third floor apartment on West Farragut in Chicago. The light on the third floor landing was out and when she opened the door to her apartment, she was grabbed around the neck and choked from behind by a man who pushed her into the apartment. He kept pushing her, through the kitchen and dining room. She turned around and saw her assailant's face. In court, she identified defendant as her attacker. She said he wore a blue jacket, jeans, and a blue knit cap. She also described him as being 5'8" tall and approximately 24 years old.

After shoving K.K. into the bedroom, he pushed her onto the bed, at a right angle to the normal sleeping position. He slapped her when she tried to resist him. Then he removed her clothes and put a pillow over her face. He lowered his own pants and lay on top of K.K., kissing and fondling her. She removed the pillow from her face, and he slapped her again. He put his fingers in her vagina and then had sexual intercourse with her. Afterwards, he slapped her again and told her to shut up.

Defendant then left K.K. and entered the kitchen. He came back into the bedroom and demanded all of her money. He left and again returned, to tell her to shut up and stay put. After a few minutes, K.K. got up, saw that defendant had left, and called the police. She noted that her wallet was gone from her purse. She subsequently talked to the police and identified defendant from some photographs. She also identified him in a lineup.

After the State rested, defendant took the stand on his own behalf. His testimony, and that of fifteen witnesses, related to his alibi defenses to the rapes of G.S., C.R., and K.K. Regarding the January 29, 1979, charge involving the complaining witness, defendant testified that he had purchased a van that night and had worked on it with two friends, in the parking lot of the Big Pit restaurant until about 7 or 7:30 p.m. Then they went into the restaurant and stayed until about 8:30 p.m. From that time until about 10:30 or 11 p.m., defendant and six of his friends rode in the van for awhile. They returned to the restaurant at 11 p.m.

Defendant further testified that on the evening of February 5, 1979, he was with his girlfriend most of the day and evening. Defendant's girlfriend, her mother, and another person testified that defendant was at their house from 7 p.m. to midnight.

On February 16, 1979, defendant spent most of the night with friends, driving around in his van and drinking beer. According to the testimony of various defense witnesses, he was in the company of others continuously from 12 noon until about 11 or 11:30 that evening.

Defendant also denied owning a blue knit ski cap or a T-shirt that had "Superkid" written on it. He admitted owning a green Army jacket

because he was in the Marines Corps Reserves. Other defense witnesses, personal friends of defendant for 6 years, stated that they had never seen him wear a hat of any kind and had not seen him in a blue ski jacket. One witness stated that defendant bought a "Superkid" T-shirt on January 30, 1979, but another witness said defendant owned a T-shirt that had "The Kid" printed on it.

Other evidence indicated that defendant was 18 years old at the time of the offense. He lived within three blocks of the apartments where G.S. and C.R. were raped. On January 31, 1979, defendant had been placed on probation for burglary.

After both sides rested, an instruction conference was held. The State submitted guilty verdict forms for each offense and one general "not guilty" verdict form. Defense counsel pointed out that the jury could find him guilty of one of the five charges and not guilty of others. The court replied that "whatever they find him guilty on, they will sign it. If not, automatically it is not guilty * * *." The defense did not object or tender any of its own forms or instructions on that point.

The jury found defendant guilty on all charges. Subsequently defendant filed a post-trial motion for a new trial, based on newly discovered evidence. He alleged in the motion that another white male had been charged with four rapes that happened in November and December of 1979 near the 1300 block of Greenleaf, where two of the rape victims in the present case resided. The court denied the motion and entered judgment on the jury's verdict.

After a sentencing hearing, the court imposed three concurrent prison terms of 25 years for rape, deviate sexual assault and home invasion, plus two concurrent prison terms of 14 years for the burlary and robbery convictions. After the sentence was announced the court granted the prosecution's motion to s.o.l. the indictments against defendant for the rapes of C. R. and K.K.

OPINION

I

Defendant contends that the trial court committed reversible error in permitting evidence of the other two rapes to be admitted on the basis of *modus operandi.* He first argues that the three crimes lack the striking similarities necessary to indicate a common scheme or method. Further, he claims that the prejudicial impact of the testimony involving the other rapes outweighs its probative value and should have been excluded on that basis.

According to the pertinent law, evidence that a defendant committed crimes other than the one for which he is being tried is inadmissible to show that he has a propensity to commit crimes. (*E.g., People v.*

*McDonald* (1975), 62 Ill. 2d 448, 343 N.E.2d 489.) Such evidence may be admitted, however, for numerous other purposes as long as its probative value outweighs its prejudicial impact. (*People v. Butler* (1978), 63 Ill. App. 3d 132, 379 N.E.2d 703.) For example, evidence of other crimes may be used to prove a fact in issue, defendant's motive, intent, identity or *modus operandi.* (*People v. McDonald.*) The latter exception to the general rule of inadmissibility has been recognized as "nothing more than circumstantial evidence of identity, the rationale being that crimes committed in a similar manner suggest a common author." (*People v. Watson* (1981), 98 Ill. App. 3d 296, 298, 424 N.E.2d 329, 331.) While the crimes need not be "identical" (*People v. Osborn* (1977), 53 Ill. App. 3d 312, 368 N.E.2d 608), they generally share features that are highly distinctive or peculiar. (*People v. Butler.*) These common features may be insufficient to raise the *modus operandi* inference individually; however, they "may yield a distinctive combination if considered together." *People v. Haston* (1968), 69 Cal. 2d 233, 245-46, 444 P. 2d 91, 99, 70 Cal. Rptr. 419, 427, quoted in *People v. Butler* (1978), 63 Ill. App. 3d 132, 141, 379 N.E.2d 703, 709.

In the pending case, although defendant argues that the evidence of the three crimes reveals nothing that is not common to any rape, we find that the record reveals enough similarities between the attacks to justify the admission of C.R.'s and K.K.'s testimony. In all three rapes the asailant wore a blue knit cap, attacked the women after entering their apartments at night, grabbed them by their necks and choked them until their resistance was overcome; forced them to lie across the width of their beds while he raped them, used or referred to a pillow, and took money from each victim's purse before leaving. In addition, each rape occurred during a three-week period, in close geographical proximity. It is true that there were differences in the attacks, but we do not find them substantial. Defendant points out that the attacker gained entrance to the three apartments in a different manner each time, spoke different words to the victims, had a strong odor in only one of the crimes, and mentioned a knife in only two of the crimes.

We do not believe that these differences overcome the strong pattern of similarity shared by all three attacks. In *People v. Therriault* (1976), 42 Ill. App. 3d 876, 356 N.E.2d 999, defendant, who was on trial for rape, was linked to another sexual attack by the following similarities: (1) the defendant entered the ground floor apartments of both victims through a kitchen window; (2) the rapes occurred during a one-month period, within five blocks of each other; (3) defendant used a gun; and (4) the victims were raped in bedrooms. In *People v. Oliver* (1977), 50 Ill. App. 3d 665, 365 N.E.2d 618, during defendant's trial for a rape-robbery, evidence of a second, similar offense was permitted into evidence. The

crimes occurred one hour apart in homes that were four blocks apart. Both victims were approached on the street by a man with a gun who initially demanded money. Both were told that defendant was trying to obtain money for his brother's drug problem. One victim, however, was raped in a yard, while the other was raped in her home. And in *People v. Emmett* (1975), 34 Ill. App. 3d 167, 340 N.E.2d 235, similarities in two deviate sexual assaults included the geographical proximity of the attacks, the short time period between the attacks, and the fact that the assailant used a knife, attacked each victim in her apartment, and made both perform oral sex upon him. One difference was defendant's method of entering the apartments; he forced his way into one apartment, but entered the other apartment after volunteering to help that victim carry her groceries.

■■ In light of these and similar cases, we do not find the differences in the instant case to be substantial. The differences in the manner of entry are just one factor to consider, as indicated in *People v. Emmett.* That defendant did not have a strong body odor in the rapes of C.R. and K.K. is hardly material, for obvious reasons. We further emphasize that, although individual similarities in the rapes may be common to rapes in general, the courts view the pattern of events in their entirety, on a case-by-case basis. Thus, in *People v. Burgin* (1979), 74 Ill. App. 3d 58, 392 N.E.2d 251, the court upheld the admission of evidence linking defendant to a rape other than the one for which he was being tried, recognizing that no single common factor or group of factors is essential to the competency of the evidence. (*People v. Burgin* (1979), 74 Ill. App. 3d 58, 68, 392 N.E.2d 251, 258, citing *People v. Osborn* (1977), 53 Ill. App. 3d 312, 368 N.E.2d 608.) The evidence in *Burgin* revealed that both victims were Northwestern University students, raped on campus after being approached by a man on a bicycle. The attacks occurred within a few blocks of each other, two weeks apart, on Saturday evenings. The assailant in both cases first spoke to the women, then grabbed them and raped them in a darkened area where few people were around. The *Burgin* court concluded that the evidence of the second attack was highly probative on the one in issue. (See also *People v. Sievers* (1978), 56 Ill. App. 3d 880, 372 N.E.2d 705 (evidence of other crimes was admissible against defendant despite differences in the details of the attacks).) We conclude that the testimony of C.R. and K.K. shared enough common features, distinctive in combination, to justify application of the *modus operandi* principle.

We next address defendant's alternative contention regarding the admissibility of this evidence. In essence, defendant argues that the State did not demonstrate sufficient *need* for the testimony of C.R. and K.K. because of the other identification evidence provided by G.S., the complaining witness. Accordingly, he maintains, the cumulative rape

evidence prejudicially outweighed its probative value. Defendant relies on *People v. Triplett* (1981), 99 Ill. App. 2d 1077, 425 N.E.2d 1236, to support his position. In *Triplett,* the murder and armed robbery convictions of defendant were reversed and the case was remanded for a new trial because of certain errors, including the erroneous admission of evidence that defendant had participated in a prior armed robbery of a Clark station. The evidence of the second offense was offered to show defendant's knowledge of the Clark station's bank deposit procedures. The appellate court rejected this use of the evidence, noting that defendant's familiarity with the procedures had already been clearly established by defendant's admission that he had worked for several Clark stations and was familiar with their procedures. The court went on to hold that the prior offense was also inadmissible under the *modus operandi* principle, citing the numerous differences in the two crimes. The similarities between the two incidences were that defendant had previously worked at both stations and the stations were robbed in the morning by someone with a gun, who drove off in a car. The methods of committing the two crimes differed in that the assailant, with another person, approached the manager of the first station on a pretext but in the second offense, a lone offender directly confronted the manager with a gun. The first robbery involved a black gun and a green two-door sedan, while the second involved a "shiny" gun and a green station wagon. The crimes were committed in a three-month period, several miles apart. The *Triplett* court held that the evidence of the prior offense had little if any bearing on the crime being tried because of these differences and that therefore the prejudicial impact of the evidence outweighed its minimal probative value.

■■ We find *Triplett* distinguishable on its facts; the offenses in the instant case are much more strongly connected. Regarding the State's need for the evidence of the other rapes, it is true that G.S., the complainant, clearly and positively identified defendant. However, we disagree with defendant's suggestion that when the State has positive identification evidence it cannot proffer additional evidence that is based on other alleged crimes. Identification of defendant was a central issue in the case and he presented many alibi witnesses. To the extent that the evidence of the other rapes strengthened the identification of defendant, it was fulfilling its purpose under the *modus operandi* principle. We conclude that the trial court did not abuse its discretion in allowing C.R. and K.K. to testify regarding their rapes.

## II

Defendant next contends that the robbery and home invasion convictions must be reversed because the State failed to prove the essential

elements of each offense. Further, he argues that the burglary conviction should be vacated as a lesser included offense of home invasion.

## A.

*The Elements of Robbery*

Robbery is the taking of property "from the person or presence of another by the use of force or by threatening the imminent use of force." (Ill. Rev. Stat. 1979, ch. 38, par. 18—1.) Defendant concedes that within the meaning of the statute, the victim was "present" when the property was stolen. (See *People v. Smith* (1980), 78 Ill. 2d 298, 399 N.E.2d 1289.) He maintains, however, that the necessary force or threat of force was missing; that the force involved in the rape cannot be imputed to the taking of the victim's property. For support, defendant relies on three cases, *People v. Patton* (1979), 76 Ill. 2d 45, 389 N.E.2d 1174, *People v. King* (1979), 67 Ill. App. 3d 754, 384 N.E.2d 1013, and *People v. Pack* (1976), 34 Ill. App. 3d 894, 341 N.E.2d 4.

We find these cases inapposite to the facts of the pending case. In *People v. Patton* the supreme court held that the simple taking of a purse from the fingertips of an unsuspecting person did not constitute sufficient force to sustain a robbery conviction. The court noted that had the purse snatching been accompanied by injury to the victim, or had defendant overcome any resistance or struggling by the victim, robbery would be the appropriate charge. Because this element was missing, however, the supreme court affirmed the appellate court's order reducing the robbery conviction to theft.

The instant case, unlike *Patton*, does not involve a simple taking of property from an unsuspecting victim. Here, it has been proved beyond a reasonable doubt that defendant exerted brutal force against G.S. when he grabbed her and choked her and raped her. It cannot seriously be contended that the victim was not subdued by defendant's actions. Defendant nevertheless adheres to the view that this force was unrelated to the taking of the victim's property, relying on *People v. Pack* and *People v. King*. In *People v. Pack* the Fifth District Appellate Court held that where the defendant entered a woman's home, choked her and left her for dead, and also took money from her nearby purse, there was no factual basis to establish the force element of robbery, because the force used against the victim was to kill, not steal. In *Pack* the facts indicated that defendant may have borne a grudge against the woman, his former part-time employer, and stole the money presumably as an afterthought.

The Fourth District Appellate Court, in *People v. King*, followed the reasoning of *Pack* and reversed a robbery conviction in a rape case. The court noted that the rape occurred in the bedroom and the victim's purse was taken from the kitchen, 15 to 30 feet away. The court stated that

"[n]owhere in the record is there any indication that the purse was taken from the *presence* of the victim with the use of force as required by the robbery statute." (Emphasis added.) (67 Ill. App. 3d 754, 759, 384 N.E.2d 1013, 1016-17.)[1] The court added that the force involved in the rape did not appear from the record to be related to the taking of the purse.

■■ In contrast to the facts of *Pack* and *King*, the present case involves evidence that defendant demanded money from G.S. at the beginning of the attack. The jury could well have inferred that he intended to rob her all along. After choking and raping her, moreover, defendant hardly had reason to anticipate any further resistance; his force against her remained in effect. Therefore, we hold that since defendant's use of force was not limited to the sexual assault and thus satisfies the robbery statute, defendant's robbery conviction must be affirmed.[2]

B.

*The Elements of Home Invasion*

Defendant further contends that the evidence fails to establish the offense of home invasion. (Ill. Rev. Stat. 1979, ch. 38, par. 12—11.) The statute defines the offense as follows:

"(a) A person who is not a peace officer acting in the line of duty commits home invasion when without authority he or she knowingly enters the dwelling place of another when he or she knows or has reason to know that one or more persons is present and
* * *
(2) Intentionally causes an injury to any person or persons within such dwelling place."

Defendant argues that he cannot be charged with knowing that the victim was in the apartment when he entered because she was not, in fact, physically present at that time. Accordingly, he maintains, one of the elements of the offense was not established.

The disingenuousness of this contention is readily apparent; it conveniently ignores the *reason* she was briefly out of the apartment. Defendant's brief admits that "[t]he clear import of the evidence was that the perpetrator had switched [the victim's] circuit breaker to 'off,' then entered her apartment, knowing that she was gone, hiding [*sic*] in the

---

[1] The *Pack* court apparently believed that the victim was not "present" during the taking of the property, but did not cite or consider cases that would support an opposing view. E.g., *People v. Braverman* (1930), 340 Ill. 525, 173 N.E. 55 (to satisfy the robbery statute, property may be taken from the presence, custody, or control of a person, and it is not necessary that the property is in the actual or immediate presence of the owner).

[2] To the extent that the *Pack* and *King* courts held that the force element of robbery was lacking when the taking of the property occurred "incident" to the physical assaults in those cases, we disagree with the soundness of the reasoning and decline to adopt it.

closet awaiting her return." Notwithstanding this admission, defendant urges us to construe the statute in a narrow and literal manner that would exempt his actions from its coverage. During oral arguments, however, defense counsel conceded that the statute might be applicable if, for example, an offender rang someone's doorbell and pulled the victim out of his dwelling, then entered and forced the victim back inside with him.

■■ We need not speculate upon numerous hypothetical situations because we find that the facts of this case strongly support the jury's conclusion that defendant entered G.S.'s dwelling place with the requisite knowledge of her "presence" therein. We have found no cases that directly bear on this issue. We believe, however, that there are two logical ways to interpret the statute to bring the facts within its coverage. First, we believe that the basement of G.S.'s apartment building could be construed as part of her "dwelling place" without inappropriately extending the meaning of the terms. According to the statutory definition of "dwelling," it means "a building or portion thereof, a tent, a vehicle, or other enclosed space which is used or intended for use as a human habitation, home, or residence." (Ill. Rev. Stat. 1979, ch. 38, par. 2—6.) Although apartment dwellers live in their individual units, they necessarily use other portions of the building, to get to and from their apartments, to do their laundry, etc. We need not definitively conclude, however, that the basement of G.S.'s apartment building was part of her dwelling because we believe that she was constructively "present" in her own apartment during defendant's course of conduct. The evidence supports the inference that he knew she was home and deliberately lured her out of the apartment by subterfuge so that he could gain entrance. Moreover, dinner was cooking and even if he did not actually switch off the circuit breakers, it appears that he would have had ample reason to know that she was "home" and that her immediate absence was temporary.[3] This is not a case in which an offender is burglarizing an apparently empty home when the owner suddenly appears or returns and the offender then harms that person before leaving. Under those facts, the offender's primary criminal intent upon entering the home is to steal property. The burglary statute adequately proscribes such conduct. The emphasis of the home invasion statute, on the other hand, is solely to protect the personal safety of people in their homes. We have no doubt that the legislative purpose of the home invasion statute would be effectuated by our holding that G.S. was within the class of people the statute was designed to protect and that defendant's conduct was of the

---

[3] Similarly, if an offender watched someone leave his house through the back door to take out the garbage and the offender slipped inside the door and then attacked the returning person, the purpose of the home invasion statute would be vindicated by construing the occupant of the house as "present" when the offender entered.

type of harm the statute was enacted to prevent. Therefore, defendant's conviction for home invasion must stand.

## C.

Next, defendant argues that his conviction for burglary must be reversed and he should be resentenced because both the home invasion and burglary offenses are based on the "identical act of entry."

■■ In *People v. King* (1977), 66 Ill. 2d 551, 566, 363 N.E.2d 838, 845, the supreme court held that "when more than one offense arises from a series of incidental or closely related acts and the offenses are not, by definition, lesser included offenses, [multiple] convictions with concurrent sentences can be entered." The dispositive question pertinent to defendant's contention, therefore, is whether burglary is "by definition" a lesser included offense of home invasion. In *People v. Bitner* (1980), 89 Ill. App. 3d 1106, 412 N.E.2d 721, the only case we have found that discusses this issue, the court held that burglary and criminal trespass to land are not lesser included offenses of home invasion, although battery is. Without extended discussion the *Bitner* court noted that "[b]urglary requires entry with intent to commit a felony or theft (Ill. Rev. Stat. 1977, ch. 38, par. 19—1(a)), while criminal trespass to land requires notice of forbidden entry (Ill. Rev. Stat. 1977, ch. 38, par. 21—3(a)). As neither of these elements was here established, we are precluded from [reducing defendant's home invasion conviction to a lesser offense]." (89 Ill. App. 3d 1106, 1111, 412 N.E.2d 721, 726.) We agree with *Bitner* that burglary requires a different mental element than does home invasion and therefore is not an included offense. This conclusion is based on the applicable law, which provides that to be a lesser included offense, the greater offense must include *every element* in the lesser offense plus one or more elements; the lesser offense does not have any element that is not included in the greater one. In other words, it is impossible to commit the greater offense without necessarily committing the lesser also. (*People v. Foust* (1980), 82 Ill. App. 3d 516, 523, 401 N.E.2d 1329, 1334-35; see Ill. Rev. Stat. 1979, ch. 38, par. 2—9(a).) Depending on the facts underlying a home invasion charge, a burglary might or might not have been simultaneously committed by an offender. In the pending case, the elements of burglary are satisfied by defendant's unauthorized entry into the victim's apartment (regardless of his "knowledge" of her presence) as long as he then had the intent to commit a theft or a felony. The evidence supports the inferences that he had the intent to steal property and to rape G.S. at that time. By definition, however, home invasion does not require that a person have a felonious intent or intent to steal at the time he or she enters a dwelling without authority. The intent requirement is "knowledge" or "reason to know" that a person is present. The home invasion offense is not

completed until the offender, armed with a deadly weapon, either uses or threatens force against the person (Ill. Rev. Stat. 1979, ch. 38, par. 12—11(a)(1)) or injures him or her (Ill. Rev. Stat. 1979, ch. 38, par. 12—11(a)(2)). Under the *Foust* test, therefore, it would not appear that every element of burglary is included in home invasion. Moreover, it would be possible to commit a home invasion without simultaneously committing a burglary if, for example, the offender entered a house, knowing someone was there, but had no intent to steal or commit a felony. If the offender struck the house's occupant with his fist (battery) and then left, the elements of home invasion would be present but the necessary commission of a felony would be lacking. Therefore, there would be no burglary. We conclude that the facts of the pending case support separate convictions of home invasion and burglary. Consonant with the supreme court's reasoning in *People v. King*, defendant's interrelated acts adequately support the multiple convictions and concurrent sentences because burglary is not, by definition, a lesser included offense of home invasion. Accordingly, we affirm the convictions of all counts as well as the corresponding sentences.

III

Defendant next contends that he was denied due process of law because the jury was given five separate "guilty" verdict forms but only one "not guilty" form. He argues that the jury could have been confused and misled because the court failed to tell the jury that by not signing a particular "guilty" form, defendant would "automatically" be acquitted of that charge. Thus, he maintains, the jury might have believed they were restricted to finding him either not guilty or guilty of *all* charges; they would not have known that he could have been found not guilty of one or more of the offenses.

Initially, we note that defendant did not proffer alternative instructions or object to the court's determination to give the State's verdict forms. Nevertheless, we will address the merits of this issue. The case law supports the practice of submitting one general not guilty form along with separate guilty forms for each count of a charge. (*E.g., People v. Brown* (1980), 87 Ill. App. 3d 368, 409 N.E.2d 81; *People v. Cole* (1977), 50 Ill. App. 3d 133, 365 N.E.2d 133; see Illinois Pattern Jury Instructions, Criminal, Nos. 26.02, 27.01, 27.02, 27.03 (2d ed. 1971).) Further, we cannot agree that the judge's oral instructions caused confusion. He simply read each verdict form in succession and told the jury to sign them according to their verdict. Although the judge did not specifically state that if they left one of the five guilty forms unsigned defendant would be acquitted as to that charge, we believe that this was implicit; the jurors undoubtedly understood that they must sign each form that corresponded to an offense

for which they found defendant guilty and had they not been persuaded beyond a reasonable doubt as to a particular count, they presumably would have left it blank. Significantly, they did not ask the court to clarify the verdict forms on that point.[4] Therefore, there is no indication from the record that the jury was misled or confused as to the possibility of finding defendant not guilty on one or more counts and we will not presume otherwise. We conclude that the State's verdict forms were not erroneous, nor the judge's oral instructions confusing, and defendant was not denied a fair trial. See *People v. Brown.*

## IV

Defendant finally contends that the trial court abused its discretion by denying his motion for a new trial based on newly discovered evidence.

After examining the record and considering the pertinent law, we reject this argument also.

The "newly discovered" evidence involves a series of sexual assaults that occurred in the same neighborhood as the one where G.S. and C.R. lived, approximately 10 months later. The suspect who was arrested for those assaults, a white male with a physical description generally similar to defendant's, apparently gained entrance to the apartment of some of the alleged victims by posing as a plumber. Defendant contends that the evidence involving this other assailant would tend to rebut the State's evidence against him.

The trial court, in its discretion, may allow a new trial based on newly discovered evidence, but must evaluate such evidence in light of the following guidelines: (1) the evidence must be conclusive and likely to change the result upon a retrial; (2) it must be material and noncumulative; (3) it must have been discovered after the trial; and (4) it must be of such a character that it could not have been discovered before trial by the exercise of due diligence. *People v. Ramos* (1980), 80 Ill. App. 3d 722, 725, 400 N.E.2d 676, 679.

■■ The new evidence in the instant case fails to meet these standards. The record contains a discussion between the judge and parties' counsel, before trial, which indicates that defense counsel knew a man had been indicted in connection with those other rapes. He asked for and received two photographs of lineups containing this man. Moreover, during trial, the photographic lineups were shown to the complainant, C.R., and K.K., who said that no one in the photographs resembled their attacker. Thus, it is evident that defendant was on notice of the suspect in the other series of

---

[4] The jury did ask the judge in writing if they needed a unanimous decision on each count for a guilty verdict, but while the court was waiting for counsel to arrive before answering, they reached their verdict.

rapes and, had the evidence seemed worthy of further investigation, he could have taken the appropriate steps to offer it into evidence. Accordingly, this cannot be viewed as evidence discovered after trial. Furthermore, this evidence appears to be immaterial to defendant's case; the only similarity between the two series of sexual assaults is the geographical location of some of them. The rapes perpetrated by defendant occurred 10 months earlier and where characterized by a different *modus operandi*. The record does not reveal any substantial connection between the assaults or the other alleged offender and defendant. We conclude, therefore, that defendant failed to establish that the newly discovered evidence was unavailable to him at trial, or that it was conclusive, material, or would change the result upon a retrial.

For the foregoing reasons, the trial court's judgment is affirmed in its entirety.

Affirmed.

LORENZ and MEJDA, JJ., concur.