THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ALONZO LEWIS, Defendant-Appellant.

First District (3rd Division)   No. 80—2449

Opinion filed June 1, 1983.

Ralph Ruebner, Richard F. Faust, and Mick Geanopoulos, all of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Lester M. Joseph, and Lawrence R. Stasica, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McGILLICUDDY delivered the opinion of the court:

Following a jury trial, defendant, Alonzo Lewis, was convicted of two counts of rape, two counts of deviate sexual assault and burglary. Defendant was sentenced to concurrent prison terms of two 25-year terms for rape, two 25-year terms for deviate sexual assault and one seven-year term for burglary. Defendant contends on appeal that: (1) the trial court erred in finding him restored to mental fitness to stand trial solely on the basis of stipulations; (2) defense counsel's acquiescence in this regard constituted ineffective assistance of counsel; (3) he was not proved guilty beyond a reasonable doubt; (4) the trial court erred in admitting evidence of another offense allegedly committed by defendant; (5) the trial court erred in admitting into evidence a mug shot of the defendant; (6) the trial court erred in refusing to take judicial notice of the times of the setting of the moon and the rising of the sun on a given day; (7) the trial court erred in restricting the cross-examination of the arresting officer.

This appeal arises from defendant's second trial for the charged offenses. He was originally brought to trial before Judge Gino Di Vito on November 5, 1979. As that trial progressed the court noted that defendant's behavior was extremely passive and that defendant was frequently sleeping through the proceedings, creating a *bona fide* doubt as to his fitness to stand trial. A fitness hearing was held pursuant to section 5—2—1 of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, par. 1005—2—1). Dr. Eugene Stern testified that in his opinion defendant suffered from paranoid schizophrenia and was in need of medical treatment as defined by the statute. In Dr. Stern's opinion the defendant was not fit to stand trial. Thus, the court declared a mistrial on November 9, 1979.

On June 19, 1980, proceedings were held before Judge Earl E. Strayhorn regarding defendant's restoration to fitness for trial. Counsel for each party stipulated that Dr. Gilbert Bogen had examined defendant on March 25, 1980, and if called to testify Dr. Bogen would state that the defendant was on that date mentally fit for trial. It was also stipulated that Dr. McGiven had examined defendant on February 28, 1980, and had found him sufficiently recovered to stand trial. No other evidence was presented. The court found defendant restored to fitness stating:

"Based upon these stipulations, there will be a finding that

Alonzo Lewis understands the nature of the charges pending against him, is able to cooperate with counsel in his own defense; is therefore, legally fit to be tried on this criminal case and the Court so finds."

Subsequently, the matter proceeded to trial. On July 12, 1978, the complaining witnesses, Rosie and Shirley and their husbands, Johnny and Willie (who were brothers), were living together, along with Rosie's two-year-old child, in a second-story apartment on West Washington Street, in Chicago. During the early morning hours, the women and the child were alone in the apartment while their husbands were at work. About 1:30 a.m., Rosie got up and walked to the bathroom. Suddenly, a man with a silk stocking over his head grabbed her face from behind the bathroom door. Rosie testified that she could see his features through the mask, and that he was clean-shaven, young and black. She ran through the apartment to the dining room where Shirley was asleep on a sofa-sleeper. The intruder chased her, cutting her beneath her right eye with a knife, and pushed her onto the sofa-sleeper with Shirley. As Shirley began to turn over, the man commanded her to remain face-down. With his knife at her throat, he ordered Rosie to lie face-down and put a pillow over her head. He told her not to move or he would kill Shirley.

The man then ordered Shirley and Rosie to put their hands behind their backs and tied Rosie's hands together with one leg tied to her hands. Then he gagged Rosie and asked her if there was any money in the apartment. When Rosie indicated that there was none, he told her would put her baby in the oven if she were lying.

Rosie testified that the man went to Shirley's side of the bed and she could hear Shirley crying and the man calling her obscene names while the bed moved. He returned to Rosie's side of the bed, pulled her to the foot of the bed, cut the rope from her leg and ripped off her panties. He tried unsuccessfully to have anal intercourse with Rosie.

Thereafter he went into the kitchen and turned on the light. Rosie testified that this also created more light in the dining room. She heard the man remove the burglar bars from the backdoor and open the refrigerator. He brought some chicken from the refrigerator into the dining room and sat down at the dining room table to eat it. Rosie was able to see the intruder's face for about two minutes as he ate. He was no longer wearing a mask. She identified defendant at trial as the same man.

When defendant finished the chicken, he returned to Rosie and turned her onto her back. He had nothing covering his face. He tore

off Rosie's nightgown and placed his penis in her vagina. At that time his face was a "couple of inches" from her and she observed him for three or four minutes. She testified that the defendant looked different at trial because he had grown a beard and mustache and had gained some weight.

Eventually defendant untied Rosie but told her not to move or he would kill Shirley. He went to Shirley's side of the bed. The bed began moving again and Rosie could hear Shirley crying. At that point, Johnny and Willie turned the lock in the front door and the intruder fled out the back. Rosie got up to let the men in and noticed that the chain had been put on the front door and that someone had placed a chair in front of the door. The apartment had been thoroughly ransacked; things had been thrown all over and some toiletries were missing from the bathroom. Rosie testified that the bathroom window was the only window or door that had not been locked that night. Rosie testified that toothpaste, draincleaner and Comet were missing from the bathroom window sill.

Shirley's testimony corroborated Rosie's testimony. She stated that after the defendant had tied her hands together and one foot to her hands, he pulled her to the foot of the bed by the rope, cut her on the leg and said that she was acting stubborn. He tore her panties off and had anal intercourse with her for about five minutes. Later she heard him make an obscene remark to Rosie and then go into the kitchen. Following more obscenities to Rosie, the intruder returned and placed his penis in Shirley's vagina for about five minutes. He stopped and fled when he heard the front door being unlocked.

The police were called immediately and three or four officers came to the apartment. Rosie testified that she could not say anything to them at that time because she was crying. The two women were taken to Loretto Hospital where they were examined and treated. Michael Zefeldt, a microanalyst for the Chicago police department, testified regarding slides (smears) taken from the vaginas of both women. The slide taken from Rosie showed the presence of spermatozoa; the one from Shirley did not. This was consistent with the women's testimony that the defendant had told Rosie that he had ejaculated. Shirley testified that he had not ejaculated while raping her.

On September 30, 1978, the women went to the police station to view a lineup. Rosie testified that she saw five men in the lineup and that she immediately identified the defendant as the man who had raped her.

Shirley testified that she was not able to see the intruder's face

for a prolonged period of time, but that she had heard his voice throughout the episode. When she viewed the lineup, the police had requested each man to repeat words used by the rapist, and Shirley identified the voice of defendant. She also identified defendant in court as the same man she had pointed out in the lineup. Shirley testified that she and Rosie had viewed the lineup separately.

Officer Mary Lewsader of the Chicago police department testified that on July 12, 1978, she went to the apartment to investigate a rape complaint. She went into the bedroom with Rosie and Shirley and their husbands. She testified that one woman was sitting on the bed staring into space and that the other was standing by the closet crying. Both were extremely upset and unable to speak coherently. Eventually, she was able to get a composite description of the rapist from the two, but she was unable to recall which woman gave her which information. According to the composite, their assailant was six feet two inches tall and weighed 165 pounds.

Over objection by defense counsel, Diane testified that on September 14, 1978, she was living in a second-floor apartment on North Central Avenue in Chicago, on the same block as the complainants' apartment. At 5 a.m. her husband left for work and she got up and locked the door. There were only two windows in the apartment and one was locked and the other was blocked by a window fan. The witness testified that she returned to bed but was awakened when she suddenly saw a man standing over her. He was holding a knife and his face was partially covered by a white handkerchief. She testified that there was daylight in the apartment. The man asked her for money and told her not to turn around or he would kill her. He put a pillowcase over her face and tied her hands and feet. He had vaginal intercourse with her as she lay on her back. He then pulled her out of bed to her knees and had anal intercourse with her. She heard him rummaging around the apartment, pulling out drawers. He opened the refrigerator and she heard him open and drink a can of beer. She asked him to take her to the washroom which he did. When she no longer heard him in the apartment, she freed herself and called the police. She testified that her apartment was "tore up, clothes and drawers and stuff was allover." In addition, two chickens, sausage, hot dogs, and lunchmeat had been taken from her refrigerator. She went to Loretto Hospital for treatment.

About two weeks later, a police investigator showed Diane some photographs, including a 1977 mug shot of the defendant. He covered the bottom half of the faces with white paper. She identified the photo of the defendant as her attacker. At trial she again identified

the photograph and identified the defendant. On cross-examination, Diane testified that the investigator had covered only the photograph of the defendant when she originally viewed them. However, on redirect she testified that the bottom halves of all the photographs had been covered. The investigating officer testified that he had covered all the photos from the nose down when showing them to Diane. Diane testified that she had not filed a complaint against defendant because she feared reprisals. Over objection by defendant, the 1977 mug shot of the defendant was admitted into evidence.

Two police officers testified that they investigated Rosie and Shirley's apartment on the night of the rape. They did not notice any chicken bones, nor did they find any fingerprints other than one of Johnny, Rosie's husband. The bathroom window was closed and there were items standing upright on the bathroom window sill.

The arresting officer testified that he apprehended the defendant on September 30, 1978, when he was spotted ducking between parked cars. On cross-examination counsel for defendant questioned the officer as to whether defendant had actually been stooping rather than ducking between cars, as though to pick something up rather than to hide. When the State objected to this line of questioning the objection was sustained.

The jury found defendant guilty of two counts of rape, two counts of deviate sexual assault and one count of burglary. Defendant was sentenced to concurrent terms of two 25-year terms for rape, two 25-year terms for sexual assault and seven years for burglary. Defendant appeals.

## I

■■ The defendant contends that the trial court erred in finding him restored to mental fitness solely on the basis of stipulations. In *People v. Reeves* (1952), 412 Ill. 555, 107 N.E.2d 861, the defendant had been found insane by a jury following a psychiatric examination and was committed. Subsequently a petition was filed by defense counsel to the effect that defendant had recovered from said insanity to the degree that he could now cooperate with his counsel and could enter a plea. A jury was impaneled to determine whether defendant had recovered. The court instructed the jury to make a finding of sanity on the basis of defense counsel's stipulation. In reversing the defendant's subsequent conviction, the supreme court stated:

> "If a defendant is insane and unable to answer for himself, he certainly is in no position to authorize his counsel to stipulate, nor is counsel warranted in stipulating, to his restoration,

which is the very issue the jury is sworn to try. Nor is the court warranted, on the basis of such a plea and without a full hearing, in instructing the jury as to the ultimate verdict on the ground of such stipulation, plea or assertion standing alone and without evidence to support such action." 412 Ill. 555, 560.

Further, Illinois courts have held that an initial adjudication of unfitness creates a presumption that the defendant remains unfit which continues until there has been a valid subsequent hearing adjudicating him fit. (*People v. Greene* (1981), 102 Ill. App. 3d 639, 430 N.E.2d 219; *People v. Williams* (1980), 92 Ill. App. 3d 608, 415 N.E.2d 1192; *People v. Johnson* (1973), 15 Ill. App. 3d 680, 304 N.E.2d 688.) The procedural requirements of a restoration hearing are equally as stringent as those of an initial competency hearing and the trial record must affirmatively show the exercise of judicial discretion where a finding of fitness is made. *People v. Greene.*

The relevant facts of the *Greene* case are nearly identical to those of the case at bar. In *Greene,* after defendant had been adjudicated unfit to stand trial because of paranoid schizophrenia in December 1975, no testimony was given at defendant's restoration hearing in December 1976. Instead, the written reports of two doctors who had examined Greene were stipulated to by counsel. On this basis, the trial court found defendant fit to stand trial. Greene was subsequently tried and convicted. In holding that Greene had not received an adequate hearing, this court stated that since the trial court's decision was based solely on unsworn psychiatric testimony, the trial court had not exercised its judgment or discretion. This court held that a judicial finding of fitness cannot be based solely on stipulation to the existence of psychiatric conclusions, because the case law of Illinois requires an adversarial hearing. Since there was no affirmative showing in the record that the trial court had exercised any discretion in finding Greene fit to stand trial, there had been in effect "no fitness hearing at all" and this court was compelled to reverse. 102 Ill. App. 3d 639, 643.

Similarly, in the case at bar, defendant was found restored to fitness solely on the basis of stipulations to unsworn psychiatric testimony. As was stated by the supreme court in *People v. Reeves* (1952), 412 Ill. 555, 107 N.E.2d 861, defendant was in no position to authorize such a stipulation nor was his counsel justified in doing so on defendant's behalf. Since we can find no showing in the record that the trial court exercised discretion in finding defendant restored to fitness, we are compelled to reverse and remand for a proper fitness hearing. Thus we need not reach the issue of ineffective assistance of

counsel. We will, however, address the other issues raised by defendant, since they are likely to reoccur should defendant subsequently be found restored to fitness.

## II

Defendant's next contention on appeal is that he was not proved guilty beyond a reasonable doubt. However, although courts of review have a duty to review the evidence, we are neither required nor permitted to substitute our judgment regarding the weight or credibility of the evidence for that of the jury. In rape cases, a jury verdict will not be set aside unless that decision is so unreasonable and palpably contrary to the manifest weight of the evidence as to raise a reasonable doubt as to defendant's guilt. *People v. Reese* (1973), 54 Ill. 2d 51, 294 N.E.2d 288; *People v. Utinans* (1977), 55 Ill. App. 3d 306, 370 N.E.2d 1080.

In the instant matter, Rosie made an immediate and positive identification of the defendant at the lineup in September 1978 and again at trial. Her testimony established that she had the opportunity to observe her attacker. Even through the stocking mask she was able to discern his features. Furthermore she later observed him unmasked, first as he sat at the table eating chicken and again as he had vaginal intercourse with her.

■ It is well established in Illinois that the identification of a single eyewitness is enough to sustain a conviction, provided that the witness is credible and that she viewed the accused under circumstances permitting a positive identification. *People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513; *People v. Novotny* (1968), 41 Ill. 2d 401, 244 N.E.2d 182.

Further, Shirley positively identified defendant's voice as that of her attacker. Identification by voice alone may establish a defendant's guilt beyond a reasonable doubt. This manner of identification goes to the weight of the evidence which is to be evaluated by the trier of fact. *People v. Nunn* (1981), 101 Ill. App. 3d 983, 428 N.E.2d 1113; *People v. Finney* (1967), 88 Ill. App. 2d 204, 232 N.E.2d 247, *cert. denied* (1968), 392 U.S. 936, 20 L. Ed. 2d 1394, 88 S. Ct. 2304.

Defendant contends that the women's identification was rendered incredible by the two-month interim between the offense and the lineup. Defendant relies on *People v. Reese* (1973), 14 Ill. App. 3d 1049, 303 N.E.2d 814. In *Reese*, the reviewing court found the prosecutrix' testimony to be less than clear and convincing. We have not reached such a conclusion in the instant matter. Thus, we believe the

two-month interim was not sufficient to render the witnesses' identification incredible.

We also reject defendant's contention that the failure of the husbands to testify in corroboration of their wives' story creates a reasonable doubt as to defendant's guilt. The husbands were not eyewitnesses to the acts committed by the defendant. The State is not required to produce every witness to a crime, and the failure to call a witness does not create a presumption that the testimony of that witness would be unfavorable to the prosecution. (*People v. Reese* (1973), 14 Ill. App. 3d 1049, 303 N.E.2d 814.) The case of *People v. Qualls* (1961), 21 Ill. 2d 252, 171 N.E.2d 612, where the court stated that it was noteworthy that the complainant's husband had not been called to testify on her behalf, is distinguishable. Unlike the case at bar, in *Qualls* the defendant raised the issues of force and consent,[1] and the complainant's husband had witnessed events relevant to these issues. In addition, the *Qualls* court noted that the testimony of the witness lacked "verisimilitude" and that "[i]n such instance the evidence of the prosecutrix should be corroborated by some other testimony, fact or circumstance." (21 Ill. 2d 252, 257.) Our review of the record in the instant matter satisfies us that the complainants' testimony was convincing. Even assuming there was some question in this regard, their testimony was corroborated by both police and hospital personnel.

Nor can we agree with defendant that a reasonable doubt was created by discrepancies between the composite description obtained immediately following the attack—that defendant was six feet two inches tall and weighed 165—and defendant's actual height, five feet eight inches, and weight, 150 pounds. In *People v. Utinans* (1977), 55 Ill. App. 3d 306, 314-15, this court stated:

> "The failure of the victim, within a matter of a few hours of traumatic sexual assaults, to recall infallibly and relate to the police every detail, description and observation does not render her later recollection of a more complete version of the events implausible. Because of the nature of the assaults and the lack of sleep, discrepancies which exist between her original statements to the authorities and her trial testimony are understandable. Such differences as exist between the two versions go only to the weight given the testimony by the triers of fact. [Citation.]"

---

[1]Defense counsel agreed at oral argument that consent was not an issue on appeal in the instant case.

In the instant matter the evidence established that both women were visibly upset, crying and initially unable to speak about the attacks, Officer Lewsader testified that she pieced together a composite and did not recall which woman supplied the information. As in *Utinans,* this investigation was carried on in the middle of the night following a harrowing ordeal. Thus, discrepancies in the defendant's description, as opposed to his actual appearance were matters for the jury to resolve in weighing the credibility of the sisters' testimony. Since they saw and heard the witnesses, we will not substitute our judgment for theirs.

Defendant additionally argues that a reasonable doubt remains as to his guilt because the State failed to prove that he entered the apartment through the bathroom window; because the State failed to introduce any evidence that chicken bones were found by the investigating officers; and because the women failed to return to Loretto Hospital for follow-up examinations for venereal disease or pregnancy six weeks after they were raped. We reject all of these arguments. Having conceded that consent was not an issue in this matter, the manner of entry into the apartment is irrelevant, as is the failure of the women to return to the hospital for further treatment.[2] Regarding the absence of evidence of chicken bones, we point out that unless an investigating officer were alerted to look for chicken bones at the scene of an alleged rape, he would be most unlikely to note their presence or to preserve them as evidence. Thus, this is not, in our opinion, probative of the credibility of the complaining witnesses.

Finally, defendant asserts that the failure of the State to find his fingerprints in the apartment creates a reasonable doubt as to his guilt. This would merely be corroboration. As we noted earlier, the clear and convincing testimony of the two women is enough to sustain his conviction. Only when an identification is vague and uncertain is additional corroboration necessary. *People v. Morrow* (1971), 132 Ill. App. 2d 293, 170 N.E.2d 487.

## III

■ Defendant's next argument is that the trial court erred in allowing Diane to testify regarding her alleged rape by defendant. As a rule, evidence of other crimes is inadmissible. (*People v. McDonald* (1975), 62 Ill. 2d 448, 343 N.E.2d 489; *People v. Gregory* (1961), 22 Ill. 2d 601, 177 N.E.2d 120.) However, there is an exception to this

---

[2]Defendant asserts that this implies that the women were acquainted with their assailant.

rule where the evidence places the defendant in proximity to time or place, aids or establishes identity, or tends to prove design, intent, motive, or *modus operandi. People v. McDonald; People v. Tranowski* (1960), 20 Ill. 2d 11, 169 N.E.2d 347, *cert. denied* (1960), 364 U.S. 923, 5 L. Ed. 2d 262, 81 S. Ct. 290.

*Modus operandi* has been recognized as circumstantial evidence of identity, on the rationale that crimes committed in a similar manner suggest a common author. *(People v. Watson* (1981), 98 Ill. App. 3d 296, 298, 424 N.E.2d 329, 331.) While the crimes need not be identical, they should share features that are highly distinctive or peculiar. *(People v. Lehman* (1955), 5 Ill. 2d 337, 125 N.E.2d 506.) Even though these common features may be insufficient to raise the inference of *modus operandi* individually, they may reveal a distinctive combination when considered together, so as to earmark both crimes as the work of the accused. *(People v. Pavic* (1982), 104 Ill. App. 3d 436, 432 N.E.2d 1074; *People v. Osborn* (1977), 53 Ill. App. 3d 312, 368 N.E.2d 608; *People v. Emmett* (1975), 34 Ill. App. 3d 167, 340 N.E.2d 235.) Although the similarities need not be unique only to the two offenses being compared, they must possess some distinctive features that are not common to most offenses of that nature in order to convincingly demonstrate *modus operandi. People v. Tate* (1981), 87 Ill. 2d 134, 429 N.E.2d 470; *People v. Barbour* (1982), 106 Ill. App. 3d 993, 436 N.E.2d 667.

In the case at bar, the evidence of the other crime tended to establish the identity of the offender as defendant, due to the following similarities: both attacks occurred on the same block; both occurred within an approximately two-month time frame; both occurred while the victims' husbands were at work and the victims were sleeping; the hands and feet of the victims were bound; the attacker was armed with a knife and threatened harm; the attacker attempted to conceal his identity to some extent; both attacks included both anal and vaginal assaults; the attacker consumed food or drink from the victims' refrigerators; both apartments were thoroughly ransacked; and in each instance the rapist stole small items, food in one and toiletries in the other.

Although certain elements might be common to many rapes, we believe the crimes shared peculiar and distinctive features, not common in sex offenses, most notably pausing to eat and drink, the binding of both hands and feet, the subsequent ransacking of the apartments, and the theft of fungible goods. When viewed in conjunction with the other similarities we believe that these features earmark both offenses as the work of one man. Thus, in our opinion, the trial

court did not err in admitting this evidence under the *modus operandi* exception.

■ The defendant correctly notes that evidence of other offenses is not admissible to bolster the credibility of the complaining witness. (*People v. Romero* (1977), 66 Ill. 2d 325, 362 N.E.2d 288; *People v. Barbour* (1982), 106 Ill. App. 3d 993, 436 N.E.2d 667.) It is true that the State argued before the trial court, but out of the presence of the jury, that they wished to offer Diane's testimony for this purpose. However, the jury was properly instructed that they should consider the evidence of other offenses solely on the issues of identification, intent and design. Thus, any error that might have occurred in this regard was harmless.

IV

■ Defendant argues that the trial court erred in admitting the mug shot with a 1977 arrest date, by which Diane originally identified him, into evidence. We agree with defendant that the mug shot was evidence of a prior arrest and not relevant to any matter in issue. Thus, it should not have been made available to the jury. *People v. Warmack* (1980), 83 Ill. 2d 112, 413 N.E.2d 1254.

The State argues that photographs not used to show a prior offense, but rather to demonstrate how a defendant was identified by a witness, may be admitted on the basis of *People v. Maffioli* (1950), 406 Ill. 315, 94 N.E.2d 191, *People v. Dean* (1981), 99 Ill. App. 3d 999, 426 N.E.2d 279, and *People v. Hawthorne* (1978), 60 Ill. App. 3d 776, 377 N.E.2d 335. However, in our opinion, those cases can be distinguished since the photograph in each was used by the complaining witnesses in identifying the defendant. In the instant case the photograph was used by Diane, not by Rosie or Shirley, the complaining witnesses, who identified defendant from a lineup.

Although we recognize that the photo may have had some probative value regarding the defendant's appearance in 1978 when all three of the women were attacked, we believe this must be balanced against the prejudicial effect of revealing another arrest to the jury. (See *People v. Hudson* (1972), 7 Ill. App. 3d 333, 287 N.E.2d 297; *People v. Hawkins* (1972), 4 Ill. App. 3d 471, 281 N.E.2d 72.) However, considering the substantial competent evidence of guilt in the case at bar, we believe this error was harmless. *People v. Warmack* (1980), 83 Ill. 2d 112, 413 N.E.2d 1254; *People v. Nicholson* (1978), 61 Ill. App. 3d 621, 377 N.E.2d 1063.

## V

■ Defendant asserts that the trial court's refusal to take judicial notice of the times of moonset and sunrise on the day of Diane's rape constituted an abuse of discretion. At the close of defendant's case in chief, defense counsel attempted to introduce this evidence in the form of photostatic copies of the Chicago Tribune.

We do not agree that this was error. Although it is well established that courts in this jurisdiction may take judicial notice of "that which everyone knows to be true" (*People v. Tassone* (1968), 41 Ill. 2d 7, 12, 241 N.E.2d 419, 422; *People v. Cain* (1973), 14 Ill. App. 3d 1003, 1006, 303 N.E.2d 756, 758), it is our opinion that the precise times of moonset and sunrise do not fall within this category.

In *Cook County Department of Environmental Control v. Tomar Industries* (1975), 29 Ill. App. 3d 751, 754, 331 N.E.2d 196, 199, this court stated:

> "[S]cientific facts which have been well established by authoritative scientists and which are generally accepted as irrefutable by living scientists may be judicially noticed."

While everyone knows that the moon will set and the sun will rise on a given day, we believe that data regarding the exact times of these phenomena, as recorded in the daily newspaper, is something less than irrefutable, scientific fact. Thus, there was no error in this regard.

## VI

■ Finally, defendant contends that the trial court erred in sustaining the State's objection to the cross-examination of the arresting officer regarding whether defendant was "ducking" or "stooping" between parked cars when apprehended. A review of the record shows, however, that at the time of the State's objection this question had been asked and answered by the witness and defense counsel was inquiring as to the witness' subjective belief as to whether there was a substantive difference between the two terms. Thus, there was no error in the trial court's ruling, since this was clearly not relevant to the issues before the court.

Accordingly, this case is reversed and remanded for a proper fitness hearing.

Reversed and remanded.

McNAMARA, P.J., and WHITE, J., concur.